JOURNAL ENTRY AND OPINION *Page 2 
{¶ 1} Appellant Juan Medezma-Palomo appeals his conviction for aggravated murder. Medezma-Palomo assigns the following errors for our review:
 "I. The State failed to produce sufficient evidence that the defendant acted with prior calculation and design and therefore the court should have granted defendant's motion for acquittal under Crim. R. 29."
 "II. The Defendant's conviction was against the manifest weight of the evidence."
 "III. The prejudicial nature of the gruesome photographs entered into evidence and published to the jury clearly outweighed any probative value and therefore prejudiced the defendant and denied him his right to a fair trial."
 "IV. The trial court erred by allowing the state to introduce improper character evidence of the defendant."
 "V. The defendant was materially prejudiced by instances of prosecutorial misconduct."
 "VI. The testimony of Richard Vega was improper and irrelevant and ought to have been excluded from evidence."
 "VII. Defendant was denied effective assistance of counsel by the failure of defense counsel to request an instruction on the lesser-included offense of murder."
 {¶ 2} Having reviewed the record and pertinent law, we affirm Medezma-Palomo's conviction. The apposite facts follow.
 Jury Trial {¶ 3} At trial, the salient facts established that sometime around the first week of January 2006, the victim, Miguel Ortiz, his roommate, Victor Pagan, and Ortiz's *Page 3 
three friends Herman Mateo, Miriam Cruz, and Medezma-Palomo began a drug binge at the apartment Ortiz and Pagan shared. The binge lasted approximately four or five sleepless days, with the parties consuming cocaine and heroin.
 {¶ 4} On January 8, 2006, at the end of the binge, Ortiz was discovered lying in a pool of blood. Ortiz died four days later. The coroner ruled the death a homicide and that Ortiz died as a result blunt force trauma to the head. The coroner concluded that the shape of the injuries indicated that they were likely caused by a blunt flattened surface with a circular configuration, such as a hammer.
 {¶ 5} The State presented the testimony of seventeen witnesses including Miriam Cruz, who testified that in the first week of January 2006, she visited Ortiz's apartment daily to engage in drug use. Cruz testified that throughout this time, Ortiz's roommate, Victor Pagan, and Ortiz's two friends, Herman Mateo and Medezma-Palomo, were always present.
 {¶ 6} In the early morning of January 8, 2006, Cruz arrived at Ortiz's apartment after walking the streets in an attempt to engage in prostitution. She knocked on the door, Medezma-Palomo opened the door, hurriedly walked past her without speaking, and left the apartment. Cruz stated that Medezma-Palomo was acting very fidgety.
 {¶ 7} Cruz entered Ortiz's bedroom, proceeded to wake Mateo to ask him for some money. Mateo told Cruz to retrieve the money from his pocket, and then went *Page 4 
back to sleep. Cruz stated that as she was leaving the room, she looked down, and saw Ortiz laying on the floor with his head surrounded by blood. She began screaming hysterically, which woke Mateo and Pagan, who tried to calm her because they thought she might have been hallucinating. Cruz told Mateo and Pagan that Ortiz was in the bedroom covered with blood. She stated that Mateo and Pagan entered the bedroom, saw Ortiz covered in blood, and both became hysterical.
 {¶ 8} Cruz went downstairs to the barbershop and asked a barber to call 911. However, she left the scene before help arrived because she was on probation.
 {¶ 9} Mary Pashke was a corrections officer at the Jefferson County Jail, where she met Mateo while he was incarcerated. She began dating him after his release. On the Friday prior to January 8, 2006, Pashke was in Cleveland to visit Mateo. However, when she arrived, she could not find him. Pashke, fearing that Mateo had resumed his drug use, began driving around the neighborhood in an unsuccessful attempt to find him.
 {¶ 10} On January 8, 2006, Pashke went to see Mateo's mother, Mary Serrano, who indicated that she had not seen Mateo in days. Pashke, accompanied by Serrano, continued to drive around the neighborhood. Eventually, Pashke stopped at Ortiz's apartment, Serrano exited the car and went up the steps to the apartment. *Page 5 
 {¶ 11} While waiting in the car in the driveway of Ortiz's apartment, Pashke observed Serrano knock on the door and heard her speak to someone. Pashke then observed Medezma-Palomo walk quickly down the steps from the apartment. As Medezma-Palomo walked past the car, he avoided making eye contact, and Pashke stated that Medezma-Palomo appeared as if he was trying to conceal something under his jacket.
 {¶ 12} Serrano returned to the car and Pashke continued to drive around the neighborhood looking for Mateo.
 {¶ 13} Later that evening Mateo returned to his mother's apartment and indicated that Ortiz had been killed. Pashke told Mateo that she had seen Medezma-Palomo leaving Ortiz's apartment and that he appeared to have been concealing something under his jacket. Pashke and Mateo got in the car and drove in the direction that Pashke had seen Medezma-Palomo walking. Pashke testified that they found Medezma-Palomo sitting on the steps of a church.
 {¶ 14} Medezma-Palomo walked over to the car, began conversing with Mateo in Spanish, and then began speaking in English. Medezma-Palomo asked Mateo if Ortiz was dead, and then stated that Ortiz got what he deserved.
 {¶ 15} Serrano went to Ortiz's apartment in an attempt to locate Mateo, Medezma-Palomo answered the door, and told her he did not know if Mateo was *Page 6 
there. Medezma-Palomo walked past Serrano, carrying a sweatshirt, and looked as if he was trying to conceal something.
 {¶ 16} Mateo spent the days prior to January 8, 2006, with Ortiz, Pagan, Cruz, and Medezma-Palomo using cocaine and heroin. Mateo stated that they were up for about three or four days without sleep. He also stated that in the early morning of January 8, 2006, after all the drugs had been consumed, Cruz left the apartment, while he and the others decided to go to sleep.
 {¶ 17} Later that morning Cruz came into the room and asked Mateo for more drugs. Mateo went outside to use the payphone to secure more drugs, but was unsuccessful. When he returned to the apartment, he saw Medezma-Palomo sitting on the couch in the living room. Mateo went back to sleep, but was later awaken by Cruz, who was asking for some money. Mateo stated he told Cruz to take the money out of his pocket and then he went back to sleep.
 {¶ 18} Moments later, Mateo heard Cruz screaming from the kitchen, "He's bleeding, he's bleeding." Mateo thought it was he who was bleeding. Mateo and Pagan went to Ortiz's bedroom and found him lying on the floor, with his head surrounded by blood. Mateo stated that he and Cruz went downstairs to the barbershop to call for help, while Pagan remained upstair. After the barber called 911, Mateo and others went upstairs to the apartment to wait for the ambulance. *Page 7 
 {¶ 19} Because Mateo was on parole, he began to panic, and decided to leave the apartment before the ambulance or the police arrived. As Mateo went to his mother's apartment, Pashke arrived a short while later, and told him that she had seen Medezma-Palomo leaving the apartment.
 {¶ 20} Mateo and Pashke got in the car and started looking for Medezma-Palomo. They found Medezma-Palomo sitting on the steps of the church where food is served to the homeless. When Medezma-Palomo approached the car, Mateo asked Medezma-Palomo what had happened to Ortiz, and Medezma-Palomo replied, "I had to do what I had to do and he deserved it."[1]
 {¶ 21} Jose Comacho had been Medezma-Palomo's neighbor on Walton Avenue in Cleveland. In December 2005, there was a fire in Medezma-Palomo's unit, which subsequently caused everyone to move from the building. Several times after Comacho moved from the apartment building, Medezma-Palomo would come to his new home and inquire about receiving money from the landlord for the things he lost in the fire.
 {¶ 22} The last time Medezma-Palomo had come to the house, Comacho told him that he had spoken to the landlord, who indicated that he was not going to reimburse Medezma-Palomo for his loss. Comacho testified that Medezma-Palomo *Page 8 
became angry when he heard that he was not being reimbursed, and stated that he had killed someone with a hammer.
 {¶ 23} Officer Eneida Horne of the Cleveland Police Department responded to Ortiz's apartment on January 8, 2006, and found a claw hammer behind the stove. The claw hammer was later determined to be the murder weapon.
 {¶ 24} At the end of the trial, the jury found Medezma-Palomo guilty of aggravated murder. On August 7, 2006, the trial court sentenced Medezma-Palomo to a prison term of twenty years to life.
 Motion for Acquittal {¶ 25} In the first assigned error, Medezma-Palomo argues the trial court erred when it failed to grant his motion for acquittal of aggravated murder. He argues the State failed to produce sufficient evidence of prior calculation and design. We disagree.
 {¶ 26} Crim.R. 29(A) provides, in part:
 "The court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, if the evidence is insufficient to sustain a conviction of such offense or offenses."
 {¶ 27} An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind *Page 9 
of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.[2]
 {¶ 28} In the instant case, Medezma-Palomo contends that the State failed to satisfy the degree of proof necessary to establish that he acted with prior calculation and design. The record before us belies this assertion.
 {¶ 29} The phrase "prior calculation and design" was employed to indicate a studied care in planning or analyzing the means of the crime as well as a scheme encompassing the death of the victim.[3] No bright-line test exists to determine whether prior calculation and design is present, instead each case must be decided on a case-by-case basis and viewed under the totality of the circumstances.[4]
 {¶ 30} In State v. Jenkins,[5] the Ohio Supreme Court set forth the following three factors that may be considered to determine if the murder was committed with prior calculation and design: (1) whether the accused and the victim knew each other; (2) whether there was thought or preparation in choosing the murder weapon *Page 10 
or the murder site; and (3) was the act "drawn out" or "an almost instantaneous eruption of events?" Neither the degree of care nor the length of time are critical factors in themselves, but they must amount to more than a momentary deliberation.[6] Prior calculation and design can be found even when the plan to kill was quickly conceived and executed.[7]
 {¶ 31} Viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found beyond a reasonable doubt that Medezma-Palomo committed the murder with prior calculation and design. Here, the record clearly reveals that Medezma-Palomo and Ortiz knew each other. Medezma-Palomo was a frequent visitor to Ortiz's apartment and communally engaged in drug use. The record also reveals that Medezma-Palomo conveniently waited until Cruz had left the apartment and until the other occupants were asleep, before he entered Ortiz's bedroom and smashed his skull with a claw hammer. Additionally, the record indicates that Medezma-Palomo fled the scene after inflicting the blows, which led to Ortiz's death.
 {¶ 32} Moreover, both Mateo and Pashke testified that Medezma-Palomo admitted committing the gruesome act when he stated that "I did what I had to do *Page 11 
and he deserved it." Jose Comacho also testified that Medezma-Palomo told him that he had killed someone with a hammer.
 {¶ 33} We conclude the evidence before us reveals a scheme designed to implement the calculated decision to kill. Therefore, the jury's verdict of prior calculation and design is justified.[8] The jury could have reasonably inferred from this evidence that Medezma-Palomo thought about killing Ortiz prior to inflicting the fatal blows, secured the claw hammer with an intention to use it when an opportunity presented itself, and then seized the opportunity to kill Ortiz after Cruz left the apartment and Ortiz, Pagan, and Mateo were asleep. Therefore, the jury could have reasonably found the required element of "prior calculation and design." Accordingly, we overrule the first assigned error.
 Manifest Weight {¶ 34} In the second assigned error, Medezma-Palomo argues his conviction was against the manifest weight of the evidence. We disagree.
 {¶ 35} In State v. Wilson,[9] the Ohio Supreme Court recently addressed the standard of review for a criminal manifest weight challenge, as follows:
 "The criminal manifest-weight-of-the-evidence standard was explained in State v. Thompkins (1997), 78 Ohio St.3d 380, 1997 *Page 12 Ohio 52, 678 N.E.2d 541. In Thompkins, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both qualitatively and quantitatively. Id. at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. Id. at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. Id. at 387, 678 N.E.2d 541. `When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a `thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony.' Id. at 387, 678 N.E.2d 541, citing Tibbs v. Florida (1982), 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652."
 {¶ 36} In the instant case, Medezma-Palomo contends many of the witnesses who testified for the State were not credible and the jury made unreasonable inferences. We are not persuaded.
 {¶ 37} The record indicates that Medezma-Palomo, Ortiz, Pagan, Mateo and Cruz were all consuming crack cocaine and heroin on a daily basis prior to that fatal day. The record also indicates that several of the State's witnesses including Pagan, Mateo, and Cruz had criminal records. However, the weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine.[10] Here, the jury apparently found the witnesses to be credible, and we do *Page 13 
not disagree with the jury's resolution of the conflicting testimony. Mateo, Pashke, and Comacho all testified that Medezma-Palomo admitted killing Ortiz. Accordingly, we overrule the second assigned error.
 Gruesome Photographs {¶ 38} In the third assigned error, Medezma-Palomo argues that the trial court erred by admitting the autopsy photographs. We disagree.
 {¶ 39} Under Evid.R. 403 and 611(A), the admission of photographs is left to the sound discretion of the trial court.[11] The trial court may admit photographs in capital cases, even if the photographs are gruesome, as long as the probative value of such photographs outweighs the danger of material prejudice to an accused.[12] We will not interfere with the trial court's balancing of probativeness and prejudice "unless it has clearly abused its discretion and the defendant has been materially prejudiced thereby * * *."[13]
 {¶ 40} Our review of the record indicates that the trial court properly admitted a number of photographs of Ortiz's body. The photographs that were admitted were relevant and not cumulative, as they were used to corroborate the coroner's *Page 14 
testimony. The photographs depicted the path of the hammer as it struck Ortiz's brain, the injuries it caused, and the cause of death. To prove its case, the State was required to establish that Medezma-Palomo purposefully killed Ortiz. The photographs illustrating the nature of Ortiz's wounds were probative of Medezma-Palomo's purpose.[14]
 {¶ 41} We conclude on the evidence before us that the photographs at issue herein were not so numerous so as to be repetitive or cumulative. The photographs illustrated witness testimony and expert forensic evidence. On balance, we find their relevancy and probative value substantially outweigh the danger of unfair prejudice to Medezma-Palomo. Accordingly, we overrule the third assigned error.
 Improper Character Evidence {¶ 42} In the fourth assigned errors, Medezma-Palomo argues the trial court erred in admitting the testimony of Comacho and Santana, who both testified that he was angry. We disagree.
 {¶ 43} Initially, we note that the decision to admit or exclude evidence is within the sound discretion of the trial court.[15] The trial court's decision to admit or exclude *Page 15 
evidence cannot be reversed absent an abuse of that discretion.[16]
The term "abuse of discretion" implies more than an error of law or judgment. Rather, the term suggests that the trial court acted in an unreasonable, arbitrary, or unconscionable manner.[17] Furthermore, when applying the abuse of discretion standard, a reviewing court is not free to merely substitute its judgment for that of the trial court.[18]
 {¶ 44} In the instant case, Medezma-Palomo claims the State called Comacho and Santana as witnesses to elicit testimony that he was an angry and violent man. We are not persuaded.
 {¶ 45} A review of the record indicates that both Comacho and Santana testified that they had been neighbors of Medezma-Palomo in an apartment building located on Walton Avenue in Cleveland, Ohio. Both men related that in December 2005, a fire occurred in Medezma-Palomo's unit. Comacho and Santana stated that as a result of the fire, they subsequently moved from the apartment building. They also stated that after the fire Medezma-Palomo visited them at their new residence and asked them to find out if the landlord was going to pay for the things Medezma-Palomo lost in the fire. *Page 16 
 {¶ 46} Comacho and Santana testified that when Medezma-Palomo visited them again, they told him that they had spoken to the landlord, who indicated that he was not going to reimburse Medezma-Palomo for his loss. Both men testified that Medezma-Palomo became angry upon learning that he was not going to be reimbursed for his loss. Comacho and Santana testified that it was during that visit that Medezma-Palomo indicated that he had used a hammer to kill someone.
 {¶ 47} We conclude on the record before us that the State's primary purpose in calling Comacho and Santana as witnesses was to elicit testimony that Medezma-Palomo indicated to them that he had killed someone with a hammer. In eliciting the testimony, the witnesses merely conveyed the context in which Medezma-Palomo made the admission. The testimony simply indicated that at the time Medezma-Palomo admitted to killing someone with a hammer, he was angry that the landlord was refusing to reimburse him for the property he lost during the fire. Consequently, the trial court did not abuse its discretion in allowing the testimony of Comacho and Santana. Accordingly, we overrule the fourth assigned error.
 Prosecutorial Misconduct {¶ 48} In the fifth assigned error, Medezma-Palomo argues he was prejudiced by two instances of prosecutorial misconduct during closing arguments. We disagree. *Page 17 
 {¶ 49} In State v. Slage,[19] the Ohio Supreme Court stated: "when we review a prosecutor's closing argument we ask two questions: `whether the remarks were improper and, if so, whether they prejudicially affected substantial rights of the defendant. State v. Smith (1984),14 Ohio St.3d 13, 14, 14 Ohio B. 317, 470 N.E.2d 883 * * *. The closing argument is considered in its entirety to determine whether it was prejudicial. State v. Mohtz (1980), 63 Ohio St.2d 150, 157,407 N.E.2d 1268 * * *."
 {¶ 50} Further, counsel is generally given latitude during closing arguments to state what the evidence has shown and what inferences can be made by the jury.[20] In determining whether the prosecutor's statements affected a sub-stantial right of the defendant, an appellate court should consider the following factors: "(1) the nature of the remarks; (2) whether an objection was made by defense counsel; (3) whether the court gave any corrective instructions; and (4) the strength of the evidence presented against the defendant."[21] *Page 18 
 {¶ 51} In the instant case, Medezma-Palomo first claims the prosecutor made statements that could be perceived that he was commenting on his constitutional right not to testify against himself. We are not persuaded.
 {¶ 52} During the State's closing argument, the following exchange took place:
 "Mr. Corrigan: * * * The only evidence in this case points to this defendant. That's the only evidence in the case, and thankfully, the defendant himself told us I did what I had to do.
 Mr. Lippe: Objection.
 Mr. Corrigan: He had it coming.
 The Court: Overruled.
 Mr. Corrigan: That's what he told us.
 The Court: Counsel, I'm going to instruct the jury that the defendant did not testify in court.
 Mr. Corrigan: To be clear, the testimony of all the witnesses in this case was that he said that to them. You don't say that out of the blue. You don't say that unless there is reason to say it. That's what he said."[22]
 {¶ 53} It is clear from the above excerpt that the prosecutor was commenting on the admissions that Medezma-Palomo made to Mateo, Pashke, and Comacho. When the prosecutor's statement is taken in context, there is no indication that it *Page 19 
could be perceived as comment upon Medezma-Palomo's constitutional right not to testify.
 {¶ 54} Moreover, the trial court also provided clarification of the prosecutor's statement. The trial court stated the following on the record:
 "With respect to Mr. Corrigan saying `he told us' originally I overruled the objection. Upon thinking of it just a moment I guessed that the grounds that you objected is `he told us' meaning that he didn't tell us in the courtroom, so therefore I did curative instruction for the record and Mr. Corrigan corrected himself in the presence of the jury. Obviously — I know they know he didn't testify, but I wouldn't want that on the record. So I just wanted to put that on the record for edification."[23]
 {¶ 55} We conclude, when the prosecutor's statement is taken in context, the prosecutor's clarification of his own statement, the trial court's curative instructions, and further clarification, Medezma-Palomo suffered no prejudice.
 {¶ 56} Medezma-Palomo next claims that he was prejudiced from the prosecutor's improper paraphrasing of Santana's testimony. We are not persuaded.
 {¶ 57} The following exchange took place during the prosecutor's closing argument:
 "Mr. Corrigan: * * * So when defense counsel stands up here and say that Miriam Cruz and Mary Pashke and Herman Mateo all sat down and got their story together, well, that is kind of interesting, given the fact that a couple of *Page 20 people who aren't related to any of them who weren't on the scene tell you the same thing.
 Mr. Lippe: Objection.
 Mr. Hernandez: Objection.
 The Court: Overruled.
 Mr. Corrigan: This guy says I just killed somebody with a hammer. Mr. Santana tells you that and Mr. Comacho —
 Mr. Lippe: Objection.
 Mr. Hernandez: Objection.
 The Court: Overruled. He's making argument, counsels. I will allow the jury to be finders of fact."[24]
 {¶ 58} Here, although the prosecutor stated that both Santana and Comacho testified that Medezma-Palomo admitted killing someone with a hammer, we find, in light of all the evidence produced at trial, it did not prejudicially affect Medezma-Palomo's right to fair trial. We conclude, that the jury, as trier of fact, could recall and differentiate the testimony of Santana and Comacho. Accordingly, we overrule the fifth assigned error.
 Irrelevant Testimony {¶ 59} In the sixth assigned error, Medezma-Palomo argues that he was prejudiced by the testimony of Richard Vega. During open statement, the State had *Page 21 
promised that Richard Vega, an institutional jailer, would testify that Medezma-Palomo admitted killing someone with a hammer. We disagree.
 {¶ 60} The record reveals that after the State began its direct examination of Vega, it became apparent that Vega could not identify Medezma-Palomo in court. A sidebar discussion ensued, after which, the trial court made the following statement:
 "In order to allow this testimony I'm going to have to find that its probative value outweighs [its] prejudicial value. He is very low on probative value. He seems as if he's trying to give you the answers that you want but he doesn't have any recollection of this individual and he's talking in generalities. Frankly, the description he is giving could be three or four people that we heard discussed in this case, so I am not going to allow his testimony."[25]
 {¶ 61} Despite the trial court's disallowing the testimony, Medezma-Palomo argues he was prejudiced. We are not persuaded.
 {¶ 62} However, upon review of the record, we find no indication that the State's promise regarding Vega's anticipated testimony prejudicially affected Medezma-Palomo's rights. Prior to the delivery of opening statements, the trial court had instructed the jury that the opening statements were not evidence but, rather, were merely previews of what each side believed that the evidence would show. Further, prosecutors are entitled to considerable latitude in opening statement.[26] In *Page 22 
our judgment, the trial court's instruction regarding opening statements and its refusal to allow the testimony, after it became apparent that Vega could not identify Medezma-Palomo in court, cured any overstatement by the prosecutor during opening statement. Accordingly, we overrule the sixth assigned error.
 Ineffective Assistance of Counsel {¶ 63} In the seventh assigned error, Medezma-Palomo argues that his defense counsel was ineffective for failing to request a jury instruction on the lesser included offense of murder. We disagree.
 {¶ 64} In order to demonstrate ineffective assistance of counsel, Medezma-Palomo must establish that his counsel's representation fell below an objective standard of reasonableness and that he has been prejudiced by his counsel's deficient performance.[27] Reversal of a conviction for ineffective assistance of counsel requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.[28]
Moreover, the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been *Page 23 
different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.[29]
 {¶ 65} Trial counsel is entitled to a strong presumption that his or her conduct falls within the wide range of reasonable assistance.[30]
Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel.[31]
 {¶ 66} In instant case, Medezma-Palomo argues that his counsel was ineffective because he failed to request a jury instruction on the lesser included offense of murder. We are not persuaded.
 {¶ 67} Even though an offense may be a lesser included offense of another, a charge on the lesser included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser included offense.[32] The trial court must instruct the jury on the lesser included offense if it is possible for the trier of fact to find the defendant *Page 24 
guilty of the lesser-included offense and not guilty of the charged offense under "any reasonable view of the evidence."[33]
 {¶ 68} Initially, we note that murder, in violation of R.C. 2903.02, is a lesser included offense of aggravated murder, in violation of R.C.2903.01(A).[34] The only difference between the two offenses is murder does not have an element of prior calculation and design, while aggravated murder does.[35]
 {¶ 69} After a careful review of the record, we find that it contains sufficient evidence from which a jury or reasonable persons could conclude beyond a reasonable doubt that Medezma-Palomo purposely, and with prior calculation and design caused the death of Ortiz. As previously discussed in the first and second assigned errors, Medezma-Palomo used a claw hammer to strike Ortiz three times in the head as Ortiz lay sleeping and intoxicated from days of inbibing cocaine and heroin. Medezma-Palomo then fled the scene, and subsequently stated to Mateo and Pashke that Ortiz "got what he deserved."
 {¶ 70} Based on the foregoing, we conclude that the evidence presented at trial would not have supported both an acquittal on the aggravated murder charge and a conviction on the charge of murder. Consequently, an instruction on the *Page 25 
lesser included offense of murder would not have been proper. As such, Medezma-Palomo was not denied the effective assistance of counsel. Accordingly, we overrule the seventh assigned error.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate be sent to said court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
FRANK D. CELEBREZZE, JR., A.J., and MARY EILEEN KILBANE, J., CONCUR
[1] Tr. at 632.
[2] State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
[3] State v. Taylor (1997), 78 Ohio St.3d 15, 19, 1997-Ohio-243.
[4] Id.
[5] (1991), 61 Ohio St.3d 259.
[6] Taylor, 78 Ohio St.3d at 19.
[7] State v. Green (2000), 90 Ohio St.3d 352, 358, 2000-Ohio-182;State v. Gerish (Apr. 22, 1994), 7th Dist. No. 92CA85.
[8] State v. Cotton (1978), 56 Ohio St.2d 8.
[9] 113 Ohio St. 3d 382, 2007-Ohio-2202.
[10] State v. DeHass (1967), 10 Ohio St.2d 230.
[11] State v. Landrum (1990), 53 Ohio St.3d 107, 121; State v.Maurer (1984), 15 Ohio St.3d 239, 264.
[12] Id. at paragraph seven of the syllabus; State v. Morales (1987),32 Ohio St.3d 252, 258.
[13] State v. Slagle (1992), 65 Ohio St. 3d 597, quoting State v.Hymore (1967), 9 OhioSt.2d 122, 128.
[14] See State v. Strodes (1976), 48 Ohio St.2d 113, 116.
[15] State v. McCain, 4thDist. No. 01CA22, 2002-Ohio-5342; State v. Bey (1999), 85 Ohio St.3d 487, 490.
[16] See, e.g., State v. Combs (1991), 62 Ohio St.3d 278; State v.Sage (1987), 31 Ohio St.3d 173; State v. Rooker (Apr. 15, 1993), 4thDist. No. 483.
[17] See, e.g., State v. Xie (1992), 62 Ohio St.3d 521; State v.Montgomery (1991), 61 Ohio St.3d 410.
[18] See, e.g., In re Jane Doe 1 (1991), 57 Ohio St.3d 135, citingBerk v. Matthews (1990), 53 Ohio St.3d 161.
[19] (1992), 65 Ohio St.3d 597, 607.
[20] State v. Hearns, 11th Dist. No. 2002-P-0050, 2004-Ohio-385, at15, citing State v. Davis (1996), 76 Ohio St.3d 107, 117,1996-Ohio-414.
[21] Id. at15, citing State v. Braxton (1995), 102 Ohio App.3d 28,41.
[22] Tr. at 982.
[23] Tr. at 984.
[24] Tr. at 967-968.
[25] Tr. at 408.
[26] State v. Ferko, Cuyahoga App. No. 88182, 2007-Ohio-1588.
[27] Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052,80 L. Ed.2d 674; State v. Bradley (1989), 42 Ohio St.3d 136.
[28] State v. Hand, 107 Ohio St.3d 378, 2006-Ohio-18.
[29] Strickland, 466 U.S at 694; Bradley, 42 Ohio St.3d at 142.
[30] See Strickland, 466 U.S. at 689.
[31] Id.; State v. Parker, 2nd Dist. No. 19486, 2003-Ohio-4326, at 13.
[32] State v. Thomas (1988), 40 Ohio St.3d 213, 216.
[33] State v. Wilkins (1980), 64 Ohio St.2d 382.
[34] State v. Mason (1998), 82 Ohio St.3d 144, 161,1998-Ohio-370.
[35] State v. Berry, Cuyahoga App. No. 87493, 2007-Ohio-278. *Page 1