[Cite as *State v. Flores Santiago*, 2020-Ohio-1274.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,          :

    v.                                      :

ARCADIO FLORES-SANTIAGO,        :

    Defendant-Appellant.         :

No. 108458

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** April 2, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-18-633027-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Justin Washburne, Assistant Prosecuting Attorney, *for appellee.*

Jennifer N. McTernan, L.L.C. and Jennifer N. McTernan, *for appellant.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendant-appellant Arcadio Flores-Santiago appeals his convictions for attempted murder and felonious assault following a bench trial. He contends

that his convictions are against the manifest weight of the evidence. For the reasons that follow, we affirm his convictions.

**Procedural History and Factual Background**

{¶ 2} On October 10, 2018, a Cuyahoga County Grand Jury indicted Flores-Santiago on one count of attempted murder in violation of R.C. 2903.02(A) and 2923.02(A), one count of felonious assault in violation of R.C. 2903.11(A)(1) and one count of felonious assault in violation of R.C. 2903.11(A)(2) in connection with the July 26, 2018 stabbing of Timothy Sumerall. All three counts included notice of prior conviction and repeat violent offender specifications.

{¶ 3} Flores-Santiago waived his right to a jury trial, and the case proceeded to a bench trial beginning on March 13, 2019. Five witnesses testified on behalf of the state: Sumerall, Cleveland police officer Lawrence McGervey, Sr., Cleveland police detectives Robert Beveridge and Mark Peoples and paramedic Richard Jeffries. Flores-Santiago testified in his defense.

{¶ 4} Sumerall testified that on the evening of July 25, 2018, he was hanging out at his apartment on Archwood Avenue in Cleveland. At that time, he had an "active addiction" to crack cocaine. An "associate" "Mollie," a prostitute, came over to his apartment that evening and brought cocaine, which the two used together. Mollie left the apartment and came back later with Flores-Santiago, whom Sumerall then knew only by the nickname "Pops." Sumerall testified that he, Mollie and Flores-Santiago had used drugs together at Sumerall's apartment "[n]umerous

times" before. Sumerall could not recall what time Mollie and Flores-Santiago arrived at his apartment.

{¶ 5} Sumerall testified that Mollie shared crack cocaine she had with the two men and that they began smoking the crack cocaine "right away" after Mollie and Flores-Santiago arrived. According to Sumerall, Mollie and Sumerall smoked their share of the cocaine in Sumerall's bedroom; Flores-Santiago smoked his share of the cocaine in the bathroom. Sumerall estimated that it took approximately 20 minutes to smoke the cocaine. Five to ten minutes later, Mollie left and Flores-Santiago came out of the bathroom.

{¶ 6} After Flores-Santiago came out of the bathroom, he asked to use Sumerall's crack pipe. Sumerall testified that both men were "high" and that Flores-Santiago was "geekin'," i.e., "wanting some more and just jittery and anxious." Sumerall did not want Flores-Santiago to use his crack pipe and the two men were "going back and forth" until Sumerall relented. As he turned to get the crack pipe, Flores-Santiago "sucker-punched" Sumerall in the neck. At that time, Sumerall was in his bedroom and Flores-Santiago was standing in the hallway by the bathroom door. Flores-Santiago "swung a couple more times" before Sumerall realized Flores-Santiago had a knife in his hand and was stabbing him. Sumerall fell back onto the bed and Flores-Santiago "rushed" him and got on top of him. As the two men "tussl[ed]" on the bed, Flores-Santiago continued to stab Sumerall in the neck, back and chest.

{¶ 7} Sumerall "got loose" and made it to the front door. Flores-Santiago followed him, and the two men began fighting again. As Sumerall was "cornered" by the front door, Flores-Santiago stabbed Sumerall in the face several times. When Flores-Santiago "eased up" for a "brief moment," Sumerall pushed Flores-Santiago off him and stumbled out the door to a nearby fire station. Sumerall estimated that it took him 45 seconds to reach the fire station. When he arrived, he immediately began banging on the windows of the fire station, trying to get someone to help him. Sumerall testified that it was "a minute or two" before someone came out to assist him.

{¶ 8} Sumerall could not recall how long Flores-Santiago was at his apartment on the morning of July 26, 2018 because he "didn't look at the clock when he walked in" but stated that he knew "exactly what happened that night." Sumerall identified Flores-Santiago as his assailant in court and stated that he was "a hundred percent sure" that Flores-Santiago was the person who had stabbed him. Sumerall testified that Flores-Santiago stabbed him 11 times, including in the neck, chin, left shoulder, chest, left side and stomach.

{¶ 9} Jeffries, a paramedic for the city of Cleveland, testified that he was working at Fire Station 20 on Pearl Road in Cleveland on the morning of July 26, 2018 when he heard Sumerall pounding on the station's front garage doors, screaming that he had been stabbed. Jeffries called dispatch, advising them of the incident, at 1:24 a.m. Jeffries stated that when Sumerall arrived at the station, he was "actively bleeding." Based on the short distance between Sumerall's apartment

and the fire station, i.e., approximately 500 to 1000 feet, he estimated that Sumerall's injury had occurred at approximately 1:21 a.m.

{¶ 10} The paramedics immediately began treating Sumerall's injuries. Jeffries testified that Sumerall was covered in blood from his neck to his waist and had potentially life-threatening stab wounds to his head, neck and torso. Jeffries could not say whether Sumerall had been using crack cocaine that evening but described Sumerall as "alert and oriented" and "clear and coherent" and stated that Sumerall did not appear to be "under the influence of a mind-altering substance" during the time he was under Jeffries' care. The paramedics transported Sumerall by ambulance to MetroHealth Medical Center for further treatment. The ambulance arrived at the hospital at 1:31 a.m.

{¶ 11} Cleveland police officers Lawrence McGervey, Sr. and Lawrence McGervey, Jr. (father and son) responded to the call. The officers first went to the fire station, but received no response. After dispatch advised them that Sumerall had been transported to the hospital, the officers proceeded to Sumerall's apartment located "a few blocks" from the fire station. The officers gained access to Sumerall's apartment building, then followed a trail of blood to Sumerall's apartment. Officer McGervey, Sr. stated that the officers' objective was to "clear[] the apartment to make sure there was no dangerous suspect in there and no other victims." He testified that upon entering the apartment, he observed "some overturned furniture," blood on the floor, blood smeared on the wall and blood leading back from the living room to a hallway in the back of the apartment. He stated that he

did not see any contraband or weapons but was not looking for them. The officers contacted dispatch and requested assistance from the crime scene unit to process the crime scene.

{¶ 12} Detective Peoples testified that he was called to the crime scene to take photographs of the blood stains that had been observed by the responding officers. He arrived on scene at approximately 2:05 a.m. and took approximately 40 photos of the apartment. Detective Peoples stated that blood was "everywhere" but that it was "pretty much dried up" by the time he arrived. Detective Peoples testified that he did not see any weapons or drug paraphernalia while he was taking photographs of the apartment. He did not process the scene for fingerprints or DNA because no request had been made to process the scene for DNA or fingerprints.

{¶ 13} After Detective Peoples completed his inspection of the crime scene, Officers McGervey, Sr. and McGervey, Jr. went to the hospital to interview Sumerall. Sumerall told the officers that his assailant was "Pops."

{¶ 14} Officer McGervey, Sr. testified that Sumerall told the officers that Pops was a "light-skinned black male," approximately 5′9″ tall, weighing 230 pounds, with short, curly hair and tattoos covering all or most of his body. Sumerall testified that he also told the officers that Pops was "pretty much about the same height" as he was, i.e., "about six feet tall," with "light skin with a tattoo, maybe about 225, something like that." According to Officer McGervey, Sr., Sumerall told the officers that he had had invited a woman he knew as "Mollie" over to smoke crack, that Mollie and Pops came over and that the three of them smoked crack cocaine

until it ran out. Sumerall told the officers that when they ran out of drugs, Pops became angry and wanted more, and that after Sumerall told Pops he had no more drugs, Pops took out a pocketknife and stabbed Sumerall in the back. Sumerall told the officers that after the stabbing, Pops and Mollie fled the scene in an unknown direction. Officer McGervey, Sr. stated that, based on what Sumerall had told them, as of the morning of the incident, the officers had a suspect in the case — Pops — but, at that time, his real name was not known.

{¶ 15} With respect to the timing of the incident, Officer McGervey, Sr. acknowledged that the police report indicated that the incident occurred between 1:00 a.m. and 1:20 a.m. Officer McGervey, Sr. could not recall the source of that information, stating that "it may have come from the victim or it might have been they was just trying to fit it into a time that would fit reasonably with all the other circumstances around it." After they completed the police report, Officers McGervey, Sr. and Jr. had no further involvement in the case.

{¶ 16} Regarding his initial description of his assailant to the responding officers, Sumerall testified that he "probably could have" told the officers the morning of the incident that the person who stabbed him was 5′9″ because "that was in the time of me being stabbed and a lot things [were] going on." He stated that he believed the person who stabbed him was "about [his] height," i.e., "about six feet tall," but "significantly heavier" than he was.[1] With respect to his assailant's

---

[1] Sumerall testified that at the time of the incident, he likely weighed approximately 147 pounds.

ethnicity, Sumerall stated that he described his assailant to police as a "light-skinned black male" even though Pops was Puerto Rican because he thought Pops was a "black but * * * light-skinned" Puerto Rican, i.e., "[t]o me he was a black Puerto Rican. Pretty much one race to me."

{¶ 17} A few days after the stabbing, on July 31, 2018, Cleveland Police Detective Murphy spoke with Sumerall on the telephone in an attempt to obtain additional information regarding the identity of Sumerall's assailant. It was not until late August or early September 2018, however, that Sumerall identified Flores-Santiago as Pops.

{¶ 18} Sumerall testified that at the time of the incident he had been using his girlfriend's phone (which did not have Pops' contact information) because his phone had been turned off. When he obtained a new phone in late August or early September 2018, Sumerall "synced" his new phone with his old phone, importing the applications, contacts and data from the old phone (including a contact number for Pops) into the new phone. Sumerall testified while he was using the messaging application "imo" on his new phone, a name and a photo of Pops appeared, connected to the phone number Sumerall had had for Pops. Sumerall stated that he did not know if the name that appeared was Pops' "real name" but that he called Detective Murphy, explained what had happened and provided her with the name and photo that appeared to be connected to the phone number he had had for Pops.

{¶ 19} After Detective Murphy determined the identity of the suspect, the case was assigned to Detective Beveridge for follow up. Detective Beveridge testified

that he reviewed the case file, including the initial police report and Detective Murphy's report, and set up an interview with Sumerall.

{¶ 20} On September 14, 2018, Cleveland police detective Jeffrey Grabski prepared a photo array for Sumerall to view that included a photo of Flores-Santiago. Sumerall identified Flores-Santiago in the array as the person who had stabbed him with "100%" certainty.

{¶ 21} On September 18, 2018, Detective Beveridge interviewed Sumerall and took photographs of his injuries. Detective Beveridge testified that prior to the interview he was aware that (1) Sumerall had told officers that he had been stabbed by Pops and (2) Sumerall had identified Flores-Santiago as his assailant in the photo array conducted by Detective Grabski. He testified that Sumerall's statements to him regarding what had occurred were consistent with what had been previously reported by the responding officers and Detective Murphy. Detective Beveridge testified that he was not aware of a potential "timing issue" in the case at the time he interviewed Sumerall but stated that he believed, based on his familiarity with the area, that Flores-Santiago "could easily" have gotten "back to the Second [District]" (where Sumerall's apartment was located) by 12:30 a.m. or 1:00 a.m. if he had been in Shaker Heights at 11:30 p.m.

{¶ 22} Sometime after the incident, Sumerall found medical documents Mollie had left at his house that had her "true name" on them. Sumerall gave the documents to Detective Beveridge. Detective Beveridge testified that he attempted to locate Mollie but was unsuccessful.

{¶ 23} In addition to the witness testimony, the state introduced several exhibits in its case-in-chief, which were admitted into evidence without objection. These exhibits included the photo array in which Sumerall identified Flores-Santiago as his assailant, Detective Beveridge's photographs of Sumerall's injuries, the medical documents Mollie left at Sumerall's apartment that Sumerall gave to Detective Beveridge, the EMS report relating to the incident, crime scene photographs taken by Detective Peoples, Sumerall's medical records relating to the incident and recordings of certain jail calls by Flores-Santiago in which Flores-Santiago refers to himself as "Pop" and others appear to refer to him as "Pop" or "Big Pop." A copy of the photo Sumerall testified "popped" up with Flores-Santiago's name through an app on his phone was admitted into evidence as a joint exhibit.

{¶ 24} At the close of the state's case, Flores-Santiago moved for acquittal pursuant to Crim.R. 29 on the attempted murder charge, arguing that there was no evidence of a purposeful attempt to kill Sumerall. The trial court denied the motion.

{¶ 25} Flores-Santiago then testified in his defense. Flores-Santiago stated that he is 6′1″, is Puerto Rican and that he weighed approximately 265 pounds in July 2018. He acknowledged that he has curly hair and tattoos covering most of his body and that he would be accurately described as "light-skinned."

{¶ 26} Flores-Santiago denied that he had the nickname "Pops." He stated that his nickname was "Pop Loty" or "[s]hortened, Pop." Flores-Santiago stated that he knew Sumerall as the "local crackhead" but that he had never been to his house.

Flores-Santiago stated that in July 2018, he was living with a friend, Shonda Schultz, and her daughter on Muriel Avenue in Cleveland.

{¶ 27} Flores-Santiago testified that on July 25, 2018, Schultz was starting a new job at a nursing facility in Shaker Heights and was "a little shaky" about using public transportation by herself to get to work. He told Schultz that he would take her to work that evening. He testified that they left home at approximately 9:05 p.m. to catch a bus to downtown Cleveland. Once they arrived downtown, they walked to the Tower City rapid station, waited for the rapid and took a rapid to Shaker Heights. Flores-Santiago testified that they arrived in Shaker Heights at approximately 11:00-11:05 p.m., then walked two or three minutes to the Shaker Gardens Nursing and Rehabilitation Center located at 3550 Northfield Road in Shaker Heights (the "nursing facility"). Time-stamped surveillance footage shows Flores-Santiago entering the lobby of the nursing facility with Schultz at approximately 11:15 p.m. on July 25, 2018 and leaving the lobby at approximately 11:20 p.m. Flores-Santiago is also seen in surveillance footage outside the nursing facility at approximately 11:21 p.m.

{¶ 28} Flores-Santiago testified that after he left the nursing facility, he walked over to a gas station across the street to buy a lighter. He then walked back to the rapid station and waited for the rapid until approximately 11:45 p.m. or 11:50 p.m. Flores-Santiago stated that he rode the rapid to the Tower City rapid station, arriving back downtown at approximately 12:35 a.m. From the Tower City rapid station, he walked to a bus stop and waited approximately 15-25 minutes for a bus

to take him home.  Flores-Santiago testified that the bus ride took approximately 35 minutes and that he arrived home at approximately 1:25 a.m. or 1:30 a.m. on July 26, 2018.

{¶ 29} On cross-examination and examination by the trial court, Flores-Santiago admitted that he had engaged in various transactions with Sumerall "off and on" since he had been released from prison in December 2017.  Flores-Santiago explained that he believed Sumerall had "put this case on [him]" because he felt Flores-Santiago owed him $700.  Flores-Santiago testified that after he was released from prison, he sold drugs.  He sold Sumerall (or a woman with whom Sumerall had been involved) "bad crack," i.e., crack cocaine mixed with baking soda, for $700.  Flores-Santiago stated that Sumerall had been "mad" following the incident and kept calling Flores-Santiago, asking Flores-Santiago to "[t]hrow [him] some money on this."

{¶ 30} Flores-Santiago testified that he had bought a laptop from Sumerall prior to the "bad crack" incident and had bought t-shirts, cologne and household items from Sumerall after the "bad crack" incident because he thought the incident was "over" and "dead."

{¶ 31} The surveillance tapes from the nursing facility were admitted into evidence along with two additional "rebuttal exhibits" offered by the state.  The "rebuttal exhibits" consisted of Google Maps printouts setting forth the distance and travel time between the nursing facility and Sumerall's apartment — ranging from 11 to 13.8 miles and from 28 to 29 minutes by car or from 1 hour 10 minutes to 1

hour 28 minutes by public transportation depending on route.[2]  The defense rested, and Flores-Santiago renewed his Crim.R. 29 motion for acquittal.  Once again, the court denied the motion.

{¶ 32} On March 19, 2018, the trial court found Santiago-Flores guilty on all counts including the specifications.  The trial court indicated that after considering the evidence, it found Sumerall's version of events more credible than Flores-Santiago's version of the events.  Flores-Santiago's demeanor when testifying also impacted the trial court's assessment of his credibility.  As the trial court explained:

> I also reviewed the time line rather extensively.  And once again, after listening to the defendant's testimony, I found his testimony to be not credible under the circumstances and not believable, and the victim's credibility certainly appeared to be much more significant from the Court's perspective.  In fact, everything that the victim said lined up almost exactly with the pieces of evidence in this particular case.
>
> But just to point out that the joint exhibit which was submitted that came up on the victim's phone, and the photograph, was a very important piece of evidence from the Court's perspective.  And so I just wanted that to be clear.
>
> In addition, the timing of the defendant's identification of the victim was also critical in the Court's decision making process.
>
> * * *
>
> THE DEFENDANT:  * * * I would just like to say that I know I did get angry when I was up on that stand but —

---

[2] The Google Maps printouts reflect travel times via public transportation as of 3:46 p.m.  There was no evidence as to whether the travel times would have been different at or around 11:21 p.m., when Flores-Santiago left the nursing facility.  However, this issue was not raised issue below, and the Google Maps printouts were admitted into evidence without objection.

THE COURT: You did. * * * [Y]our own testimony was angry, aggressive. * * * But even what you said didn't make any sense, right? You know that your statement was very, very unusual.

THE WITNESS: I don't understand.  What statement are you speaking of?

THE COURT: Well, for example, why you said that the victim, you know, why he would pin this on you.

THE WITNESS: Because I burned him.  I burned him.

THE COURT: Right.  That whole portion of your testimony did not make any sense to the Court. * * * It was unusual from my perspective.  You did seem to be very angry when you were testifying, which was very concerning because of what you were saying.  Coupled with your demeanor, it did not appear that you — you did not appear to have a great deal of credibility from the Court's perspective under those circumstances. * * * You said that the victim was the neighborhood crackhead, but you didn't explain that you bought stuff from him.  That you sold him drugs.  That you've been in his, you know, place.  That you've been around his place, in front of his place.  You didn't say any of that, right? * * *

{¶ 33} The trial court determined that the two felonious assault counts merged with the attempted murder count for sentencing and sentenced Santiago-Flores to a 15-year prison sentence, i.e., 11 years on the attempted murder charge and four years on the repeat violent offender specification, to be served consecutively.  The trial court also imposed five years of mandatory postrelease control.

{¶ 34} Flores-Santiago appealed, raising a single assignment of error for review:

The trial court found against the manifest weight of the evidence that the defendant-appellant committed the acts alleged in Counts 1, 2, and 3 of the indictment.

**Law and Analysis**

{¶ 35} A manifest weight challenge attacks the credibility of the evidence presented and questions whether the state met its burden of persuasion. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26; *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 13. Weight of the evidence "addresses the evidence's effect of inducing belief," i.e., "whose evidence is more persuasive — the state's or the defendant's?" *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386-387, 678 N.E.2d 541 (1977). When considering an appellant's claim that a conviction is against the manifest weight of the evidence, the appellate court functions as a "thirteenth juror" and may disagree "with the factfinder's resolution of * * * conflicting testimony." *Thompkins* at 387, citing *Tibbs v. Florida*, 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). The appellate court examines the entire record, weighs the evidence and all reasonable inferences that may be drawn therefrom, considers the witnesses' credibility and determines whether, in resolving conflicts in the evidence, the trier of fact "'clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). Reversal on manifest weight grounds is reserved for the "'exceptional case in which the evidence weighs heavily against the conviction.'" *Thompkins* at 387, quoting *Martin* at 175.

{¶ 36} Flores-Santiago contends that his convictions were against the manifest weight of the evidence due to the "delay" in identifying him as a suspect and because: (1) there was a "complete lack of physical evidence" connecting him to the crime; (2) no one corroborated Sumerall's version of the events; (3) Sumerall's "perception of that night was severely impaired by his crack cocaine use"; (4) because Sumerall's testimony and prior statements regarding what occurred the night of the incident were inconsistent and contradictory and (5) the state's timeline was implausible, i.e., Flores-Santiago could not have reasonably made it back from the Shaker Heights nursing facility where he was seen on video surveillance at 11:21 p.m. in time to stab Sumerall. We disagree.

{¶ 37} Physical evidence is not required to sustain a conviction against a manifest weight challenge. *See, e.g., State v. Robertson,* 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, ¶ 32 ("[A] lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence."); *State v. Rusnak,* 7th Dist. Jefferson No. 15 JE 0002, 2016-Ohio-7820, ¶ 30 (fact that no physical evidence from the crime scene was presented at trial did not render verdict against the manifest weight of the evidence); *State v. Thomas,* 2d Dist. Montgomery No. 27362, 2018-Ohio-4345, ¶ 25 (fact that defendant's conviction was based solely on victim's testimony and not any physical evidence did not render his conviction against the manifest weight of the evidence).

{¶ 38} A conviction may rest solely on the testimony of a single witness, including the victim, if believed, and there is no requirement that a victim's

testimony be corroborated to be believed. *See, e.g., State v. Black*, 8th Dist. Cuyahoga No. 108001, 2019-Ohio-4977, ¶ 43; *State v. Schroeder*, 4th Dist. Adams No. 18CA1077, 2019-Ohio-4136, ¶ 84; *State v. Dudley*, 9th Dist. Summit No. 28364, 2017-Ohio-7044, ¶ 10; *see also State v. Robinson*, 8th Dist. Cuyahoga No. 100126, 2014-Ohio-1624, ¶ 12 ("'Even where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so long as a reasonable [factfinder] could find the eyewitness testimony to be credible.'"), quoting *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 52.

{¶ 39} Likewise, simply because Sumerall was using drugs and was "high" at the time of the incident does not mean his testimony could not be relied upon to convict Flores-Santiago. *See, e.g., State v. Nitsche*, 2016-Ohio-3170, 66 N.E.3d 135, ¶ 43-44, 46 (8th Dist.) (witnesses' testimony could be relied upon to support defendant's convictions arising out of two shootings notwithstanding that witnesses were intoxicated or "getting high" prior to shootings); *State v. Wells*, 8th Dist. Cuyahoga No. 98388, 2013-Ohio-3722, ¶ 130 (credibility of witnesses in murder case was left to the jury where witnesses admitted they were high on crack cocaine the day of the murder); *State v. Medezma-Palomo*, 8th Dist. Cuyahoga No. 88711, 2007-Ohio-5723, ¶ 36-37 (fact that witnesses "were all consuming crack cocaine and heroin on a daily basis" did not preclude the jury from finding their testimony to be credible). At trial, Sumerall admitted that he had been smoking crack cocaine and was "high" at the time the stabbing occurred but claimed that his drug use did not affect his ability to perceive what happened that night. Jeffries testified that when

he saw Sumerall immediately following the stabbing, Sumerall was "alert and oriented" and "clear and coherent." The trial court could properly consider all this information when deciding the credibility of, and how much weight to give, Sumerall's testimony.

{¶ 40} Similarly, a defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory. *See, e.g., Nitsche* at ¶ 45; *see also State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38 ("'A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236, 1996 Ohio App. LEXIS 2245, 7 (May 28, 1996).

{¶ 41} While there were some minor inconsistencies between Sumerall's trial testimony and statements he had previously made to police, such as the fact that Sumerall had originally described his assailant as a 5′9″ light-skinned black male (and Flores-Santiago is a 6′1″ Puerto Rican male) and the fact that Sumerall had told police that he had invited Mollie over that evening to smoke crack cocaine (and later testified that Mollie and Pops had shown up at his apartment uninvited), his statements and testimony were consistent in many material respects.

**{¶ 42}** Most significantly, Sumerall was unwavering in his identification of Pops (later identified as Flores-Santiago) as his assailant. Sumerall provided a detailed description of Pops as an overweight, light-skinned male with short, curly hair and tattoos covering most of his body when he spoke with Officers McGervey, Sr. and McGervey, Jr. at the hospital shortly after the stabbing. Sumerall's contemporaneous description of his assailant, in large part, matched the appearance of Flores-Santiago at the time of the incident. Sumerall provided a similar description of his assailant to Detective Murphy a few days later. The only "delay" in Sumerall's identification of Flores-Santiago as his assailant occurred because Sumerall did not know Pops' legal name. Although Sumerall may not have known Flores-Santiago by his legal name at the time of the stabbing, Flores-Santiago was not a stranger to Sumerall; it was undisputed that the two men knew each other prior to the stabbing. Sumerall unequivocally identified Flores-Santiago as his assailant both during the photo array and when testifying at trial. The trial court found Sumerall's testimony regarding the operation of the cell phone application, linking a photo of Flores-Santiago to the contact information Sumerall had for Pops, credible. We do not disagree.

**{¶ 43}** Although Flores-Santiago testified regarding a time line that he contends would have made it impossible for him to have stabbed Sumerall, there were inconsistencies and omissions in Flores-Santiago's testimony that could have reasonably led the trial court to disbelieve him. For example, although during his direct examination, Flores-Santiago implied that he had nothing to do with

Sumerall, knowing him only as the "local crackhead," during cross-examination and further examination by the trial court, he admitted that he had, in fact, engaged in multiple business transactions with Sumerall both before and after the stabbing. Likewise, although Flores-Santiago denied that he was ever known by the nickname "Pops," in the recordings of calls Flores-Santiago made from jail, he and others repeatedly refer to Flores-Santiago as "Pop" or "Big Pop."

{¶ 44} Further, the state presented evidence from which it could be reasonably found that even if Flores-Santiago had taken public transportation back home after leaving the nursing facility, he could have made it to Sumerall's apartment at or before 12:50 a.m., in sufficient time to stab Sumerall within the timeline laid out in Sumerall's and Jeffries' testimony.

{¶ 45} This case came down to the credibility of Sumerall and Flores-Santiago. Based on the evidence presented, the trial court found Sumerall's version of events to be more credible than Flores-Santiago's version of the events. Following a thorough review of the record, weighing the strength and credibility of the evidence presented and the reasonable inferences to be drawn therefrom, we cannot say that this is one of those "'exceptional cases'" in which the trier of fact clearly lost its way and created a manifest miscarriage of justice that the defendant's convictions must be reversed. *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541, quoting *Martin*, 20 Ohio App.3d at 175, 485 N.E.2d 717. Accordingly, we overrule Flores-Santiago's assignment of error.

{¶ 46} Judgment affirmed.

It is ordered that appellee recover from appellant the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the Cuyahoga County Court of Common Pleas to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

MARY J. BOYLE, P.J., and
MICHELLE J. SHEEHAN, J., CONCUR