[Cite as *State v. Rusnak*, 2016-Ohio-7820.]

STATE OF OHIO, JEFFERSON COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 15 JE 0002 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| STANLEY RUSNAK | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:       Criminal Appeal from the Court of
                                Common Pleas of Jefferson County,
                                Ohio
                                Case No. 14 CR 112

JUDGMENT:                       Affirmed.

APPEARANCES:

For Plaintiff-Appellee:          Atty. Paul Scarsella
                                 Jefferson County Special Prosecutor
                                 Ohio Attorney General's Office
                                 150 E. Gay Street, 16th Floor
                                 Columbus, Ohio  43215

For Defendant-Appellant:         Atty. Richard H. Drucker
                                 820 W. Superior Ave., Suite 800
                                 Cleveland, Ohio  44113

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Mary DeGenaro

                                 Dated:  November 18, 2016

WAITE, J.

{¶1} Appellant, Stanley Rusnak ("Rusnak"), appeals his conviction on two counts of murder in the Jefferson County Common Pleas Court. On January 21, 2015, a jury convicted Rusnak of murdering his uncle, Kelsie Noble, and his uncle's caretaker, Sophie Bell, on or about April 1, 1975 at Mr. Noble's residence. Based on the record before us, the judgment of the trial court is affirmed.

Statement of Facts

{¶2} On April 1, 1975, the bodies of Kelsie Noble and Sophie Bell were found in Noble's home in Jefferson County. Investigation of the scene revealed evidence that a gun had been shot through a window directly across from where Bell's body was found. There was evidence that the shotgun blast wound through her body. Noble was found in his bed with a shotgun blast through his chest.

{¶3} Noble had been bedridden due to a terminal illness. Bell was one of his caretakers. Another of Noble's caretakers, Ethel Friend, arrived at the Noble residence on the morning of April 1, 1975 to relieve Bell, who worked the overnight shift. Friend discovered damage to the exterior door of the home and, on entering, discovered Bell's body. Friend immediately left the premises and summoned help from a nearby telephone repairman working in the area. The sheriff's office was called and an investigation began.

{¶4} Several individuals were considered early in the investigation, but the focus eventually narrowed on two suspects: Frank Forst and Rusnak. Over the intervening years, several sheriffs would reopen the case and continue to investigate leads in an attempt to accumulate enough evidence to bring charges. In 2014 the

case was finally presented to a grand jury which returned indictments against Rusnak for the murders of Noble and Bell, and for another unsolved murder (Robert Scott) in 1977. Prior to trial, Rusnak filed a motion to sever the counts of the indictment based on the separate incidences. The motion was denied by the trial court on November 24, 2014. On November 26, 2014, Rusnak filed a motion to dismiss based on the length of the pre-indictment delay. The trial court overruled that motion on December 8, 2014. The matter proceeded to a jury trial on January 20, 2015.

{¶5} A number of individuals testified at trial about statements Rusnak made on several different occasions regarding his involvement in the murders. Sheriff Abdalla testified about statements made by Rusnak to him during an investigation early in his tenure as sheriff and which Abdalla believed may have constituted a confession to the offenses. On January 21, 2015, the jury found Rusnak guilty of the murders of Noble and Bell, but not guilty of the murder of Robert Scott. On January 23, 2015, the trial court sentenced Rusnak to consecutive sentences of imprisonment of 15 years to life on both of the murder convictions. Appellant subsequently filed this timely appeal.

## FIRST ASSIGNMENT OF ERROR

THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION TO DISMISS DUE TO THE DELAY IN SEEKING AN INDICTMENT IN THIS CASE.

{¶6} In his first assignment of error, Rusnak contends the pre-indictment delay violated his due process rights because the delay was unjustifiable and served

only to the advantage of the state. Rusnak argues there were two periods of delay: from 1975 to 2004 and from 2004 to 2014. He contends the evidence utilized to bring the indictment was obtained years earlier and that other evidence had been lost in the intervening time period; thus, the delay interfered with Rusnak's ability to raise an adequate defense.

{¶7} The state asserts there was no prejudice and the delay was not unreasonable. The state contends that the fact that certain evidence was lost during the time period in question was placed directly in front of the jury and that fact was weighed with all the evidence presented.

{¶8} A two-part test is utilized to determine whether pre-indictment delay may have deprived a defendant of due process. First, the defendant must demonstrate that he was actually or substantially prejudiced by the delay. *State v. Luck,* 15 Ohio St.3d 150, 154, 472 N.E.2d 1097 (1984). Secondly, the burden then reverts to the state to produce evidence of a justifiable reason for the delay. *Id.* The state has no duty to present evidence justifying a delay until the defendant establishes actual prejudice. *State v. Jones,* Slip Opinion No. 2016-Ohio-5105, ¶ 18. The court then views the prejudice in light of the state's stated reason for delay. *Id.* See, also, *State v. Christman,* 7th Dist. No. 786, 1999 WL 343411 (May 28, 1999).

{¶9} To determine actual prejudice, we review the prejudice alleged by Rusnak and balance this with all of the other evidence. *Id.* Rusnak alleges he was prejudiced by: (1) lost and misplaced evidence; (2) the unavailability of witnesses; (3) no request for a consensual search of Rusnak; (4) failure to provide autopsy

evidence; (5) failure to record the 2004 interview between Abdalla and Rusnak; (6) testimony from witnesses relying on recollections that were over thirty years old; and (7) minimal evidence collected after 2004.

{¶10} Although there was a nearly forty-year delay in bringing an indictment in the instant case, extended delay, by itself, is not prejudice. *Luck*, at 154. Thus, Rusnak's assertion that all of the witnesses' testimony stems from long term recollections and that certain (unnamed) witnesses may be deceased does not demonstrate actual prejudice. As the United States Supreme Court noted in *United States v. Marion,* 404 U.S. 307, 92 S.Ct. 455 (1971), "that memories will dim, witnesses become inaccessible, and evidence be lost" are not "in themselves enough to demonstrate that [defendants] cannot receive a fair trial and to therefore justify the dismissal of the indictment." *Id.* at 326. In order to show prejudice from a lack of availability of a witness, the defendant must not allege mere speculation, but must show the exculpatory value of the testimony. *United States v. Doerr,* 886 F.2d 944, 964 (7th Cir.1989). Rusnak makes no such argument here and raises only speculative assertions.

{¶11} In arguing Rusnak's contention that the state presented no evidence that law enforcement requested a consensual search, that the state failed to present autopsy evidence, and that there was no recording of the 2004 interview between Rusnak and Abdalla, Rusnak simply speculates as to the type of evidence that may have ultimately been revealed. This does not meet the defense's burden of demonstrating actual prejudice. Appellant complains that no evidence relating to an

autopsy was presented and that he was never asked to consent to a search in order to obtain evidence. What any of this may have revealed and whether any exculpatory evidence would have been brought to light is clearly speculative, at best. It is just as likely that any such evidence might be inculpatory as exculpatory, and failure to present this amorphous evidence is clearly not related to any temporal delay. *Id.* The parties stipulated that the cause of death in each case was from a gunshot wound, and testimony from Sheriff Abdalla revealed that a shotgun does not provide the ballistics information that can be obtained from a pistol.

**{¶12}** Regarding Rusnak's interview with Abdalla conducted shortly after he was elected as sheriff, Abdalla testified that it was a two-hour interview and there was no audio or video recording equipment available at that time, but that he took notes during the interview which were preserved. He testified that Rusnak said "[w]ell, I'll tell you right now I did it because you don't have my DNA. You got to prove it." (Trial Tr., p. 280.) The fact that the interview itself was not recorded is not, per se, prejudicial. Any contrary determination would render every interview between law enforcement and a suspect prior to the widespread availability of recording equipment worthless from an evidentiary standpoint. The testimony of Abdalla regarding the interview was no different than any other witness testimony. Rusnak remained free to attack the credibility of Abdalla and the other witness and any alleged statements made.

**{¶13}** Regarding lost or misplaced evidence, Rusnak contends he was unable to utilize scientific testing from items recovered from the crime scene in order to

exculpate himself as the offender. Hence, the loss of this evidence was prejudicial to his defense. However, Rusnak does not contend that such scientific tests were available in 1975 when the crime occurred. The question now becomes: what type of evidence was once available and was missing or lost prior to the indictment being issued, and whether this loss caused Rusnak actual prejudice. The parties agree that certain physical evidence was lost in the intervening years. This evidence consisted of shotgun wadding, clothing, fingerprints, a bloody handprint and footprint castings, all originally collected from the crime scene.

**{¶14}** While Rusnak alleges that loss of his ability to utilize scientific testing of these pieces of evidence and appears to argue that this loss, alone, amounts to prejudice. His argument in this regard is mistaken. At trial, Sheriff Abdalla testified that the fingerprints obtained from the crime scene were submitted for evaluation in 1986 shortly after he took office but deemed not suitable for comparison by the testing facility. Fingerprints from Rusnak were obtained in 2004, and the sheriff then sent the fingerprints from the scene to be again tested and compared to Rusnak's. Again, the prints were determined to be insufficient for comparison. While Abdalla also testified that today's today's DNA technology was not available at the time he took office, Rusnak was aware that certain evidence was unavailable for scientific testing long before he was indicted. He appeared to believe this loss aided his defense. Abdalla testified that Rusnak admitted to him that he committed the crimes in an interview undertaken shortly after Abdalla became sheriff, but that he challenged the sheriff's department to prove it based on their lack of DNA evidence.

(Trial Tr., p. 296.) Additionally, the state presented evidence as to the mishandling of the physical evidence at the time it was gathered in 1975 as well as the number of individuals, including Rusnak, who had been permitted to enter the crime scene during the investigation. Hence, even if the evidence had been physically preserved, its value as either inculpatory or exculpatory was likely nil. Further, the state presented testimony of no less than eight individuals, all of whom testified that Rusnak had made statements over the years that he killed Noble and Bell. Hence, this record shows that the arguments Rusnak advances as to the prejudicial effect of the lost physical evidence, when looked at in light of all of the testimony, including the value of current scientific testing, is also highly speculative. It does not appear from this record that Rusnak was prejudiced by this loss, as he claims.

{¶15} The last factor cited by Rusnak as being prejudicial due to pre-indictment delay is that the state collected only minimal evidence since 2004. Hence, the state cannot show any justification for delay that occurred after that time. After 2004, the state's additional investigation led to statements from witnesses Frank Forst and Michael Calvert. Contrary to Rusnak's assertion, both provided key testimony regarding Rusnak's statements about the crimes. Forst, who for a time was also a suspect in the case, testified that Rusnak called off work the night of the killing in question and called Forst for a ride home. Forst testified that he noticed blood on Rusnak's clothing when he picked him up and that Rusnak said he was at his Uncle Kelsie's house, and that he had shot him. (Trial Tr., pp. 254-256.) Forst indicated that he did not go to the police with this information earlier because he had

his own legal "issues." Calvert testified that in 2010 or 2011 Rusnak informed him while they were seated at a bar that a long time ago he shot his uncle, and on another occasion he stated that he shot a woman. Although downplayed in significance by Rusnak, both of these witnesses provided key additional evidence of Rusnak's involvement in the crime.

**{¶16}** Even if we could accept Rusnak's claim that he was substantially prejudiced for any of the reasons he advances, the state presented justifiable reasons for the delay. Pursuant to *Luck, supra,* pre-indictment delay is unjustifiable when:

> [T]he state's reason for the delay is to intentionally gain a tactical advantage over the defendant, see *United States v. Marion, supra,* or when the state, through negligence or error in judgment, effectively ceases the active investigation of a case, but later decides to commence prosecution upon the same evidence that was available to it at the time that its active investigation was ceased.

*Id.* at 158.

**{¶17}** Abdalla testified that he took office as sheriff in 1986 and began working on this case mid-1986. He said that he began working on cold case files along with the current law enforcement cases. Abdalla had spoken to a number of prosecutors and attorneys general about the matter over the ensuing years, but that due to staff changes, he did not receive help in earnest in the form of attorneys, detectives or agents to assist in the investigation until around 2007 or 2008. (Trial

Tr., p. 291.) The sheriff indicated that prior to that time there was little evidence to go on and not enough to pursue an indictment. Abdalla testified that the state attorney general's office was guiding the investigation and wanted more evidence prior to seeking an indictment in this case.

{¶18} In *United States v. Lovasco,* 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the United States Supreme Court noted:

> [P]rosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt. To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself."

*Id.* at 791, quoting *United States v. Ewell,* 383 U.S. 116, 120, 86 S.Ct. 733, 15 L.Ed.2d 627 (1966).

{¶19} In the instant matter, the complexity of a cold case and the investigative delay involved does not automatically violate a defendant's right to due process. Although we note there is a certain level of prejudice inherent in a delay of any sort, the value in having law enforcement conduct a thorough investigation that, as here, may involve late witness revelations as to key elements of a crime is not overcome by any of the factors alleged by Rusnak to amount to actual prejudice in this case. His allegations amount to mere speculation. Rusnak has not demonstrated any actual or substantial prejudice to warrant the judgment of acquittal he seeks. Rusnak's first assignment of error is without merit and is overruled.

<u>SECOND ASSIGNMENT OF ERROR</u>

THE TRIAL COURT COMMITTED REVERSIBLE ERROR BY FAILING TO DISMISS THE CHARGES AGAINST THE APPELLANT AFTER THE STATE OF OHIO FAILED TO PRESERVE PROBATIVE RELEVENT [SIC] EXCULPATORY EVIDENCE.

**{¶20}** In his second assignment of error Rusnak asserts the trial court erred and violated his due process rights when it refused to dismiss the indictment due to the loss of physical evidence gathered during the investigation. While generally alleging the importance of this evidence in his first assignment, Rusnak now argues that loss of the physical evidence, alone, required dismissal of the charges against him.

**{¶21}** The suppression of evidence that is materially exculpatory violates a defendant's due process rights, regardless of whether the state acted in good or bad faith. *State v. Geeslin,* 116 Ohio St.3d 252, 2007-Ohio-5239, 878 N.E.2d 1, ¶ 7, citing *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In order to be materially exculpatory, the evidence at issue, "must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means." C*alifornia v. Trombetta,* 467 U.S. 479, 489, 104 S.Ct. 2528 (1984). "Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt." *Id.* at 485.

**{¶22}** We have previously held that the mere possibility that evidentiary material could potentially have exculpated the defendant does not meet the threshold standard of constitutional materiality. *State v. Sutton,* 7th Dist. No. 08 MA 26, 2009-Ohio-1203, ¶ 1. "A clear distinction is drawn by *Youngblood* between materially exculpatory evidence and potentially useful evidence. If the evidence in question is not materially exculpatory, but only potentially useful, the defendant must show bad faith on the part of the state in order to demonstrate a due process violation." *Geeslin* at ¶ 10. Thus, when evidence is only potentially exculpatory, its loss or destruction does not violate a defendant's due process rights unless the state acted in bad faith in destroying the evidence. *State v. Miller,* 161 Ohio App.3d 145, 2005-Ohio-2516, 829 N.E.2d 751 (2d Dist.).

**{¶23}** "Bad faith" generally implies something more than bad judgment or negligence and imputes a dishonest purpose, moral perversity, conscious wrongdoing, breach of a known duty through some ulterior motive, or ill will rising to the level of fraud. It also embraces actual intent to mislead or deceive another. *State v. Durham,* 8th Dist. No. 92681, 2010-Ohio-1416, ¶ 13.

**{¶24}** In *Sutton*, we examined a situation where an OVI stop was videotaped but the tape had been subsequently erased. As this video may have proved either inculpatory or exculpatory, we determined that the defendant was unable to demonstrate the evidence was materially exculpatory. As such, it was only potentially useful and its destruction did not automatically result in a due process violation. The *Sutton* analysis applies in the instant case. Again, the physical

evidence to which Rusnak refers includes fingerprints, blood and clothing obtained from the scene in 1975. These were in the possession of the sheriff's department until 2004 when, according to Sheriff Abdalla, they were sent to the FBI and BCI for testing and apparently never returned. All testing came back as inconclusive; thus, the evidence fails the first portion of the *Trombetta* test which requires that it possess an exculpatory value apparent before it was destroyed or lost. The crux of Rusnak's argument is that he was deprived of the chance to retest the evidence using more modern technology in the hope that it would prove both conclusive and exculpatory. While it is possible Rusnak is correct in his hope, it is equally possible that advanced testing at this later date would prove the evidentiary materials to be inculpatory. In any event, pursuant to *Sutton,* we cannot find that the missing evidence cited by Rusnak is materially exculpatory.

{¶25} Because the evidence does not qualify as materially exculpatory, our inquiry turns to whether it would be potentially useful and whether it was destroyed in bad faith. Rusnak never raised this issue to the trial court, and for that reason alone we could disregard these arguments. In the interest of justice, however, we will review Rusnak's arguments. Although having the physical evidence from the scene might potentially prove useful to both the state and the defendant, who may have an additional opportunity to seek testing with updated technological and scientific advancements in forensics, there is absolutely no indication, and certainly no evidence, that the evidentiary material was destroyed in bad faith. We earlier discussed the testimony that the crime scene was apparently severely mishandled

and that several persons, including Rusnak, were allowed access to the scene. This would leave all physical evidence collected of questionable value. Abdalla testified as to the handling of the case by multiple sheriffs over the years and that the evidence collected had been submitted for testing. Although it is troubling that the sheriff's department admits to shoddy handling of the initial crime scene and appears not to have made a concerted effort at relocating the evidence after testing proved inconclusive, this record in no way demonstrates a dishonest purpose or conscious wrongdoing on the part of law enforcement regarding the loss of this evidence that can be said to rise to the level of bad faith.

**{¶26}** Rusnak's second assignment of error is without merit and is overruled.

### THIRD ASSIGNMENT OF ERROR

THE VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶27}** In determining whether a jury verdict is against the manifest weight of the evidence, the reviewing court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Thompkins,* 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A reversal on weight of the evidence is reserved for only exceptional circumstances where the evidence weighs heavily against the conviction. *Thompkins* at 387.

**{¶28}** Rusnak was convicted on two counts of murder in violation of R.C. 2903.02(A) which provides that, "[n]o person shall purposely cause the death of another." In finding Rusnak guilty of two counts of murder, the jury was required to find that Rusnak purposely caused the death of Kelsie Noble and Sophie Bell.

**{¶29}** A person acts "purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature." R.C. 2901.22(A).

**{¶30}** Rusnak argues that the lack of physical evidence should have resulted in his acquittal. The fact that there was no physical evidence from the crime scene presented at trial does not render the verdict against the manifest weight of the evidence. *State v. Jackson,* 7th Dist. No. 09 JE 13, 2009-Ohio-6407. Physical evidence was not required to link Rusnak to the crimes, because of the testimony of several key witnesses that Rusnak had informed each of them that he committed the crimes.

**{¶31}** Ben Batenburg testified that Rusnak came to his home shortly after the murders saying that, "[w]hen Sophie got hit she bled like a stuck pig." (Trial Tr., p. 135.) Larry Haught testified that Rusnak was a frequent visitor to a local bar where a number of local coal workers gathered and that he approached a group shortly after the murders and stated, "Sophie Bell, she bled like a stuck hog." (Trial Tr., p. 149.) Haught testified that Rusnak had made this statement on more than one occasion

over the years. (Trial Tr., p. 152.) George Singleton, who was Rusnak's brother-in-law for a short time, testified that Rusnak informed him that "she [Bell] bled like a stuck pig and she looked like a salt and pepper shaker the blood come out of her so bad." (Trial Tr., p. 165.) Albert Nicholson testified that he was at a bar called The Farm Inn one night with a group of friends and Rusnak was present. He testified that Rusnak spoke loudly so that everyone could hear that Bell "bled like a stuck hog." (Trial Tr., p. 174.)

{¶32} While Rusnak is correct that he could have gathered this information merely from his presence at the crime scene after the killings, the prosecution did not rest on only this testimony. There was testimony from Joe Neilly, who stated that he was in a local bar when Rusnak entered and sat next to him:

> He asked me if I heard about the - - the murders, the lady and the old man and I said "Yeah." And he said "I did that." He said "I went down and tapped on the window." And he called her a nurse. He said "When the nurse came to the window I shot her through the window." He says "And then I went in the house and took the old man off the oxygen and I shot him."

(Trial Tr., p. 217.)

{¶33} There was also testimony from Michael Calvert who testified that he socialized with Rusnak at local bars. One night, in 2010 or 2011, Rusnak told him that he shot his uncle. (Trial Tr., p. 233.)

**{¶34}** Importantly, Frank Forst testified that he worked with Rusnak at the coal mine and that Rusnak called off of work on the evening of the incident. Rusnak called Forst asking for a ride in the early morning hours. When Forst arrived, he noticed that Rusnak had blood on his clothes. Rusnak told Forst that he had been at his uncle's house and that he shot him. (Trial Tr., p. 255.) Forst testified that Rusnak, "[s]hot Sophie through the window cause [sic] she was watching TV in the chair, watching TV in the chair, then went in the house and shot Kelsie laying in the bed." (Trial Tr., p. 256.) Forst also indicated that Rusnak repeatedly told him about the incident off and on during the next several years and his story never changed. (Trial Tr., p. 258.)

**{¶35}** Sheriff Abdalla also testified about his investigation of the case over a period of several years, and about his own efforts from the time he took office in 1986 until the indictment in 2014. He specifically testified that he phoned Rusnak in 2004, who was living in Cleveland, and asked him to come in for an interview. The interview lasted approximately two hours. Abdalla testified:

> Well, first he asked me that "Could you take DNA and spread it around a crime scene?" And I said "No, we don't do that." He said "Well, I'll tell you right now I did it because you don't have my DNA. You got to prove it.

(Trial Tr., p. 280.)

**{¶36}** Sheriff Abdalla testified that testing of fingerprint and handprint evidence from the crime scene came back inconclusive due to the quality of the

prints. (Trial Tr., p. 293.) The state also admitted into evidence a number of photographs of the crime scene as well as a sketch of the crime scene drawn by one of the investigating detectives at the time.

{¶37} Rusnak asserts that none of the witnesses knew that Rusnak had been at the crime scene after the killings during the investigation and that he could have received his information about the condition of the bodies because he was at the scene. He also maintains that the witnesses' memories may be faulty from the number of intervening years and because many of the conversations took place in bars while drinking alcohol. The jury did hear Rusnak's assertions as to these issues. Rusnak argues that we should discredit the witness testimony and rely, instead, on the fact that there was no physical evidence presented. This case, like many others, rests on witness credibility. If believed, the testimony of multiple witnesses that Rusnak himself discussed his involvement in the crimes would be enough to convict Rusnak for the killings. If the testimony is believed, the lack of physical evidence from the crime scene does not render the conviction against the manifest weight of the evidence. The jury was aware that the murders happened many years ago, were aware that Rusnak actually visited the crime scene and that most of these statements were made in bars where a certain amount of alcohol was involved. And yet, testimony by multiple witnesses over multiple years with similar stories from Rusnak about the events in question coupled with Sheriff Abdalla's testimony regarding the interview he held with Rusnak were found to be credible by the jury members. Although the appellate court acts as a "thirteenth juror" when

considering whether the manifest weight of the evidence requires a reversal, we must also lend deference to the factfinder's determinations as to witness credibility. *State v. Deltoro,* 7th Dist. No. 07 MA 90, 2008-Ohio-4815, ¶ 62. The conviction is not against the manifest weight of the evidence. Rusnak's third assignment of error is without merit and is overruled.

<u>FOURTH ASSIGNMENT OF ERROR</u>

THE TRIAL COURT ERRED WHEN IT DENIED THE APPELLANT'S MOTION TO SEVER COUNTS ONE AND TWO FROM COUNT THREE FOR TRIAL.

**{¶38}** Pursuant to Crim.R. 8(A), two or more offenses may be charged in the same indictment if the offenses "are of the same or similar character * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." The Supreme Court of Ohio has also noted that joinder of criminal offenses in a single trial is favored. *State v. Brinkley,* 105 Ohio St.3d 231, 2005-Ohio-1507, ¶ 28.

**{¶39}** Crim.R. 14, Relief from Prejudicial Joinder states:

If it appears that a defendant or the state is prejudiced by a joinder of offenses or of defendants in an indictment, information, or complaint, or by such joinder for trial together of indictments, informations or complaints, the court shall order an election or separate trial of counts, grant a severance of defendants, or provide such other relief as justice requires.

A defendant claiming error in the trial court's refusal to allow separate trials of multiple charges under Crim.R. 14 has the burden of affirmatively showing that his rights were prejudiced; he must furnish the trial court with sufficient information so that it can weigh the considerations favoring joinder against the defendant's right to a fair trial, and he must demonstrate that the court abused its discretion in refusing to separate the charges for trial.

*State v. Torres,* 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981), syllabus. Moreover, when the evidence of the other crimes would be admissible even if the counts were severed and the evidence of each crime is distinct and straightforward, then joinder is not prejudicial. *State v. Schaim,* 65 Ohio St.3d 51, 59, 600 N.E.2d 661 (1992). The decision to join offenses for trial will not be reversed absent an abuse of discretion. *Id.*

{¶40} Rusnak argues here, as below, that Count 3 of the indictment relating to the murder of Robert Scott should have been severed from Counts 1 and 2 relating to the murders of Noble and Bell, for which he was convicted. The crux of his argument is that there was a "spillover affect" where the jury might infer a criminal disposition to Rusnak, causing prejudice. In support, he attempts to refute the witnesses' testimony and attack witness credibility.

{¶41} The joinder, here, resulted in presentation of evidence on all three murders despite the separation of years between the Noble and Bell murders and the Robert Scott disappearance. The jury ultimately found Rusnak guilty of the Noble

and Bell murders and not guilty of the murder of Robert Scott. The evidence as to each was distinct and simple. It consisted of photographs from each scene as well as testimony from several witnesses. The majority of the witnesses testified about Rusnak's own statements regarding his involvement in the Noble and Bell murders. Although there was a time gap of approximately two years between the two separate incidents, there is no evidence in the record of any "spillover effect" as argued by Rusnak. It is apparent from the verdicts that the jury was able to hear testimony from multiple witnesses regarding all counts and was able to separate the testimony regarding each count in order to reach a determination on each count distinctly. The fact that the jury did not find there was sufficient evidence to convict Rusnak for the Scott murder reflects that there was no "spillover" or inference of criminal disposition. Consequently, the trial court did not abuse its discretion in holding a single trial on all counts.

{¶42} Accordingly, Rusnak's fourth assignment of error is without merit and is overruled.

## Conclusion

{¶43} Based on the foregoing, Rusnak did not demonstrate actual prejudice relative to the pre-indictment delay. The loss of physical evidence in this case did not rise to the level of constitutional materiality and regardless, no bad faith on the part of the state was shown. Rusnak's convictions were not against the manifest weight of the evidence and the trial court did not abuse its discretion by the joinder of all the

offenses for trial.  Accordingly, all four of Rusnak's assignments of error lack merit.

The judgment of the trial court is affirmed in full.

Donofrio, P.J., concurs.

DeGenaro, J., concurs.