[Cite as *State v. Williams*, 2024-Ohio-838.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                               :

    Plaintiff-Appellee,          :

                                       No. 112800

    v.                            :

TORIANO WILLIAMS,                            :

    Defendant-Appellant.         :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 7, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-656439-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Kevin Filiatraut, Assistant Prosecuting Attorney, *for appellee.*

Walter H. Edwards, *for appellant.*


MARY J. BOYLE, J.:

{¶ 1} Defendant-appellant, Toriano Williams ("appellant"), appeals his convictions for aggravated murder, aggravated burglary, murder, felonious assault,

and having weapons while under disability.  For the reasons set forth below, we affirm appellant's convictions.

## I.  Facts and Procedural History

{¶ 2}  In February 2021, appellant and Jannie Pace ("codefendant") were charged in a six-count indictment.[1]  Count 1 charged both of them with aggravated murder; Count 2 charged both of them with aggravated burglary; Count 3 charged both of them with murder; Count 4 charged both of them with felonious assault; and Count 5 charged appellant with having weapons while under disability.  Count 6 was a weapons count that only applied to the codefendant.  Each of Counts 1 through 4 carried both a one- and three-year firearm specification.

{¶ 3}  In March 2023, appellant's case proceeded to trial.  Counts 1 through 4 were tried to a jury while Count 5 was tried before the bench.  The following evidence was adduced at trial.

{¶ 4}  In the early morning hours of Wednesday, September 23, 2020, Porsha Woods ("victim"), was found shot to death in her apartment in Cleveland, Ohio.  Immediately prior to her death, the victim made two 911 calls.  The first call came in at 5:16:23 a.m.  In this call, the victim told the operator that the people downstairs pulled a gun on her and were out in the hallway at that moment. She requested police assistance. The victim explained that earlier that evening the girl downstairs knocked on her door and said something about the victim's brother, that

---

[1] Codefendant voluntarily dismissed her appeal in *State v. Jannie Pace*, 8th Dist. Cuyahoga No. 112790 (Sept. 8, 2023).

then she and that female fought, and that female's boyfriend pulled a gun. The operator, who testified at trial, attempted to get more information from the victim, but the victim was not responding to the questions and just repeated "they are in the hallway right now." The victim did state that the male was light-skinned with a black shirt. The operator told the victim she was sending police and then hung up the phone, noting in the system that the caller stated, "The people downstairs pulled a gun on her two hours ago. The suspects are in the hallway." The call lasted 3 minutes and 51 seconds.

{¶ 5} At 5:20:35 a.m., the victim made a second 911 call. In this call, the victim does not say a word, but loud voices can be heard in the background, as well as banging and popping noises. Then the phone disconnected. That operator tried to call back two times but neither call was answered; each call went straight to voicemail on the victim's phone.

{¶ 6} Police arrived on scene at approximately 5:26 a.m. and found the victim's body behind her door, curled into a ball, still holding a baseball bat. The victim had been shot in the head, chest, abdomen, and thigh. She also had a graze wound to her left forearm. Police collected the spent shell casings found around her body. The victim's residence, Unit 4, showed signs of forced entry, as well as the appellant's residence, Unit 1. After investigating the scene, police also gathered a knife, a hammer, and the baseball bat from Unit 4, as well as a tactical light for a handgun from Unit 1 for evidence. In the stairway between Units 1 and 4, police collected a red weave they believed to be connected to the incident.

{¶ 7} The victim's brother, Chauncey Bizzell ("Bizzell"), testified that his sister had only lived in Unit 4 for approximately three weeks before she was killed. Bizzell met the codefendant one day when he was there helping his sister. The codefendant was waiting for an Uber when Bizzell offered her a ride. The codefendant accepted the ride. They drove around to run some errands and eventually ended up at a hotel where they got high on PCP and other illicit drugs. Shortly after arriving at the hotel, the codefendant called her boyfriend for a ride home.

{¶ 8} Bizzell also testified that in the early morning hours of September 23, 2020, Bizzell received a voicemail from his sister, the victim, where she yelled at him because a female, later identified as the codefendant, came to her apartment and they fought and a man, later identified as appellant, pulled a gun on her. This voicemail was the last time Bizzell ever heard from his sister.

{¶ 9} During the investigation, police learned that on September 23, 2020, the victim had a prior physical altercation with the codefendant in the apartment stairwell. This altercation took place around 1:00 a.m., while the victim was on the phone with her cousin Janese Banks ("Banks"). Banks testified that she was on the phone with the victim when the victim said, "[T]his B at my door, she's mad that I told [Bizzell] she has a boyfriend, and he has a gun." While on the phone, Banks heard the victim get into a fight, so she rushed over to the apartment. When Banks arrived, she observed that the victim was visibly upset and disheveled like she had just gotten in a fight. The victim was outside hitting the apartment building door

with a hammer. Banks took the victim across the street to her grandmother's house where the victim relayed to Banks that the boyfriend of the lady who lives downstairs pointed a gun at her. When they went back to the apartment building, Banks saw blood going up the stairs and a hair weave in the hallway. Banks left the victim at her grandmother's house where she thought the victim would stay for the night.

{¶ 10} Banks returned 45 minutes later after learning that gunshots were heard from the victim's building. When interviewed, Banks was unable to identify the individuals involved in the fight but believed she had seen a light-skinned brown female and a light-skinned male in the building when she helped the victim move into her new apartment.

{¶ 11} Police learned that a black Chevy Malibu was captured on city cameras at 5:21 a.m. leaving the area of the apartment building. This vehicle continued in a direction away from the apartment building. Cleveland Police Detective David Shapiro ("Det. Shapiro") used Vigilant, a private camera system, to continue tracking the vehicle seen on the real-time crime cameras and to identify the license plate of the vehicle of interest. The black Chevy Malibu was registered to Jennifer DeMoss ("DeMoss").

{¶ 12} DeMoss testified that the appellant asked her to put the car in her name in June 2020, which she did, but the car belonged to and was in the possession of the appellant. The police tracked down and towed the black Chevy Malibu from the appellant's stepfather's house on E. 140th Street on September 25, 2020. The

stepfather testified that appellant just sold him the vehicle that Thursday, September 24, 2020.

{¶ 13} On January 24, 2021, the codefendant was arrested in connection with the murder. She later entered into a plea agreement with the state wherein she pled guilty to involuntary manslaughter, with a three-year firearm specification, and aggravated burglary, and agreed to testify truthfully against the appellant.

{¶ 14} The codefendant testified that she had been dating appellant at the time of the incident. She explained that she met the victim's brother previously and received a ride from him. She described the encounter with Bizzell much the same as Bizzell did adding that she left because she did not want to do drugs with him, so she called appellant to pick her up. After appellant picked her up, Bizzell called her phone and appellant informed him that whatever was going on was over.

{¶ 15} The codefendant further testified that the night before the murder, she had gotten into an argument with the victim. She told the victim that Bizzell tried to drug her while they were at a motel. The codefendant and the victim then got into a physical altercation, and the victim pulled out her hair weave.

{¶ 16} After the fight, the codefendant went with appellant to a hotel. While at the hotel, the appellant received a phone call that the victim had broken into his apartment. The appellant then grabbed a large black gun off the dresser and headed back to the apartment building with the codefendant. When they returned to the apartment building, the codefendant testified that she observed the victim pacing

back and forth in her own apartment with a baseball bat. Appellant went past codefendant, straight into the victim's apartment, and shot her seven times.

{¶ 17} The codefendant testified that they left the apartment complex and drove to appellant's brother's house in his black Chevy Malibu. The codefendant claimed that she went with appellant instead of helping the victim because she did not want to be shot as well. She testified that she heard the appellant tell his brother he lost his temper and told his brother to get rid of the weapon. She never observed the appellant with the black handgun again but did see him with a shotgun at some point.

{¶ 18} During the trial, the codefendant admitted to being a drug user and having mental health problems. She testified that although she had lied to the police about her involvement before, she was telling the truth to the jury. She testified that she lied because she was afraid for her life and potentially her family if appellant found out she talked to the police. The codefendant testified repeatedly that she was there and witnessed appellant shoot the victim seven times in the early morning hours of September 23, 2020, and then left with him in the black Chevy Malibu.

{¶ 19} Appellant was found guilty on all five counts as charged in the indictment, including the accompanying firearm specifications. On May 3, 2023, appellant was sentenced to 36 years to life in prison. Appellant appeals his convictions, raising the following assignments of error for review:

> **Assignment of Error I:** The verdicts were against the manifest weight of the evidence.

**Assignment of Error II:** The verdicts were not supported by sufficient evidence.

**Assignment of Error III:** The trial court erred by admitting inadmissible hearsay.

**Assignment of Error IV:** The trial court erred by disallowing admissible testimony about a prior firearm incident in the victim's apartment.

{¶ 20} For ease of discussion, we will address these assignments of error out of order and together where appropriate.

## II. Law and Analysis

### A. No Abuse of Discretion — Testimony Admissibility

{¶ 21} In the third and fourth assignments of error, appellant challenges the admissibility of the victim's statements, as well as statements made by a lay witness to Det. Shapiro.

{¶ 22} It is well-settled that the admission or exclusion of evidence rests within the sound discretion of the trial court. *State v. Sage*, 31 Ohio St.3d 173, 180, 510 N.E.2d 343 (1987). An abuse of discretion occurs when a court exercises "its judgment, in an unwarranted way, in regard to a matter over which it has discretionary authority." *Johnson v. Abdullah*, 166 Ohio St.3d 427, 2021-Ohio-3304, 187 N.E.3d 463, ¶ 35. As the gatekeeper of the evidence, the trial court "must be cognizant of the evidence the state is attempting to admit into evidence. If the state fails to comport with the basic requirements under the law, the trial court is obligated to exclude such evidence, even if no objection is raised." *State v. Walker*, 8th Dist. Cuyahoga No. 110741, 2022-Ohio-1238, ¶ 32.

### 1. The Victim's Statements were Admissible

{¶ 23} In appellant's third assignment of error, the appellant asserts that the trial court erred when it admitted hearsay statements the victim made to Banks while on the phone hours before her murder. The state argues that the statements were admissible under a hearsay exception pursuant to Evid.R. 803(1) and (2) or as nonhearsay statements.

{¶ 24} "'Hearsay' is a statement, other than one made by the declarant while testifying at trial or hearing, offered into evidence to prove the truth of the matter asserted." Evid.R. 801(C). Generally, hearsay testimony is inadmissible unless the testimony falls within one of the recognized exceptions to the hearsay rule. Evid.R. 802.

{¶ 25} Present-sense impression is an exception to the hearsay rule. Evid.R. 803(1) defines a present-sense impression as "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter unless circumstances indicate lack of trustworthiness." Regarding Evid.R. 803(1), "[t]he key to the statement's trustworthiness is the spontaneity of the statement; it must be either contemporaneous with the event or be made immediately thereafter." *State v. Essa*, 194 Ohio App.3d 208, 2011-Ohio-2513, 955 N.E.2d 429 ¶ 126 (8th Dist.). "'The principle underlying this hearsay exception is the assumption that statements or perceptions, describing the event and uttered in close temporal proximity to the event, bear a high degree of trustworthiness.'" *State v. Dixon*, 152 Ohio App.3d 760,

2003-Ohio-2550, 790 N.E.2d 349, ¶ 12 (3d Dist.), quoting *Cox v. Oliver Machinery Co.*, 41 Ohio App.3d 28, 35, 534 N.E.2d 855 (12th Dist.1987).

{¶ 26} In this case, the appellant takes issue with the following testimony by Banks: (1) the victim "was cussing, she was, like, Well, this B is at my door. She's mad that I told [Bizzell] she has a boyfriend, and he has a gun. And I told her to call the police or to leave and go across the street to my grandmother's house"; (2) the victim told her the boyfriend in question "was downstairs in the house and the girlfriend was at her door arguing and they started the fight while I was on the phone"; and (3) she "understood" the victim to mean that "the girl's boyfriend" had a gun when she had stated "he has a gun."

{¶ 27} Appellant asserts that the altercation had already occurred when the victim called Bank's; therefore, it was not a present-sense impression. Appellant further argues that being angry is not the "state of emotional shock" that allows a statement's admission under the excited-utterance exception.

{¶ 28} We find the appellant's arguments unpersuasive. A review of the record reveals that Banks testified that the victim called her and was upset and angry because the codefendant was *at her door yelling* and that *while she was on the phone* with the victim, she heard the victim getting into a fight. Banks further testified that she went to the victim's apartment because of what she heard over the phone. The statements at issue were made while the declarant-victim was perceiving the events, which fits squarely under the exception for present-sense

impression under Evid.R. 803(1). Therefore, we find that the trial court did not abuse its discretion when it admitted the victim's statements.

{¶ 29} As a result, the third assignment of error is overruled.

**2. Hearsay Testimony was Properly Excluded**

{¶ 30} In the fourth assignment of error, appellant argues that the trial court erred when it precluded defense counsel from questioning the detective regarding a previous report of a person with a gun in the victim's apartment, claiming that the statements were nonhearsay because the detective learned it through his investigation. The state argues that the information was inadmissible hearsay, as well as irrelevant.

{¶ 31} As stated above, generally hearsay is inadmissible unless it fits a hearsay exception, and "[e]vidence which is not relevant is not admissible." Evid.R. 402. Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Evid.R. 401.

{¶ 32} Appellant complains that counsel was not allowed to inquire if Det. Shapiro had "come to know" that Evon Gocan ("Gocan"), the alleged owner of the building, was present in the building during the shooting, whether he had "learned about a prior incident" several days before in the victim's apartment, or if he was "aware of" or had "a description provided to him" of the incident wherein an individual was in the victim's apartment with a rifle. Appellant argues that "Ohio courts have long held that out-of-court statements are admissible to explain the

actions of a police officer during an investigation and are not hearsay." *State v. Johnson*, 2018-Ohio-1389, 110 N.E.3d 800, ¶ 44 (8th Dist.), citing *State v. Davis*, 116 Ohio St.3d 404, 2008-Ohio-2, 880 N.E.2d 31.

{¶ 33} A review of the transcript and arguments of counsel do not shed light on how these statements directed the actions of the detective for the statements to be characterized as nonhearsay. In addition, it is unclear whether the statements were made directly to the detective who was testifying at trial. Further, no exception to the hearsay rule was offered to admit the statements of Gocan; it was only argued that it was nonhearsay. Finally, the relevance of the statements is questionable because the evidence at trial indicated that a .40-caliber handgun was used to kill the victim, not a rifle. Consequently, we find that the trial court did not abuse its discretion when it excluded Gocan's statements.

{¶ 34} Appellant's fourth assignment of error is overruled.

## B. Appellant's Convictions were Supported by Sufficient Evidence

{¶ 35} In appellant's second assignment of error, he argues that the state failed to present sufficient evidence of "force" to support a conviction for aggravated burglary because the codefendant testified that the door was open and the appellant brushed past her. The state argues that regardless of whether the jury believed appellant broke into victim's apartment or merely "entered through an open door," the force element was met, citing *State v. Erker*, 8th Dist. Cuyahoga No. 107790, 2019-Ohio-3185, ¶ 69.

{¶ 36} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. An appellate court's function when reviewing sufficiency is to determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 37} With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A sufficiency-of-the-evidence argument is not a factual determination, but a question of law. *Thompkins* at 386.

{¶ 38} In *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, the Ohio Supreme Court cautioned:

> But it is worth remembering what is not part of the court's role when conducting a sufficiency review. It falls to the trier of fact to "'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" [*State v. McFarland*, 162 Ohio St.3d 36, 2020-Ohio-3343, 164 N.E.3d 316, ¶ 24], quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Thus, an appellate court's role is limited. It does not ask whether the evidence should be believed or assess the evidence's "credibility or effect in inducing belief." *State v. Richardson*, 150 Ohio St.3d 554, 2016-Ohio-8448, 84 N.E.3d 993, ¶ 13, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541. Instead, it

asks whether the evidence against a defendant, if believed, supports the conviction. *Thompkins* at 390 (Cook, J., concurring).

*Id.* at ¶ 16.

{¶ 39} Here, appellant was convicted of aggravated burglary in violation of R.C. 2911.11(A)(1), which states:

> No person, by force, stealth, or deception, shall trespass in an occupied structure or in a separately secured or separately occupied portion of an occupied structure, when another person other than an accomplice of the offender is present, with purpose to commit in the structure or in the separately secured or separately occupied portion of the structure any criminal offense, [and] the offender inflicts, or attempts or threatens to inflict physical harm on another[.]

"Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01(A)(1).

{¶ 40} The codefendant's attempts to minimize her involvement and the appellant's culpability are of no consequence; the evidence at trial was that the victim's door was forced open. The first 911 call from the victim clearly indicates that immediately prior to her death she was requesting police assistance because she was inside her apartment and the appellant and codefendant were outside her door. In the second 911 call, loud banging and popping noises can be heard. Finally, state's exhibits Nos. 8 through 17 clearly depict the damage to the victim's door, door frame, and lock. Accordingly, we find that there was sufficient evidence that appellant entered the victim's apartment by force.

{¶ 41} Appellant also argues that the verdicts were based on insufficient evidence "premised on the same arguments set forth" in the first assignment of

error, in which he argues the lack of physical evidence and the credibility of the witnesses.

{¶ 42} When conducting a sufficiency review, assessing the credibility of the witnesses and weighing the evidence is not appropriate and such arguments will be addressed under the manifest weight standard of review. Therefore, we find that after viewing all the evidence in the light most favorable to the state, a rational trier of fact could find all the essential elements of aggravated murder, aggravated burglary, murder, felonious assault, and having weapons while under disability proven beyond a reasonable doubt.

{¶ 43} Accordingly, Appellant's second assignment of error is overruled.

## C. Appellant's Convictions are Not Against the Manifest Weight of the Evidence

{¶ 44} In appellant's first assignment of error, appellant argues that his convictions are against the manifest weight of the evidence because there was no physical evidence linking him to the crimes, the witnesses lacked credibility and their testimony was inconsistent, and the police investigation was lacking.

{¶ 45} When reviewing a manifest weight challenge, an appellate court, "'weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Virostek*, 8th Dist. Cuyahoga No. 110592, 2022-Ohio-1397, ¶ 54, quoting *State v. Martin*, 20 Ohio

App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "'only in the exceptional case in which the evidence weighs heavily against the conviction.'" *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *Martin* at 175.

{¶ 46} As this court has previously stated:

> The criminal manifest weight-of-the-evidence standard addresses the evidence's effect of inducing belief. *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins*, 78 Ohio St.3d at 386, 678 N.E.2d 541 (1997). Under the manifest weight-of-the-evidence standard, a reviewing court must ask the following question: whose evidence is more persuasive — the state's or the defendant's? *Wilson* at id. Although there may be legally sufficient evidence to support a judgment, it may nevertheless be against the manifest weight of the evidence. *Thompkins* at 387; *State v. Johnson*, 88 Ohio St.3d 95, 2000-Ohio-276, 723 N.E.2d 1054 (2000).
>
> When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the manifest weight of the evidence, the appellate court sits as a "thirteenth juror" and disagrees with the fact finder's resolution of the conflicting testimony. *Wilson* at *id.*, quoting *Thompkins* at *id.*

*State v. Williams*, 8th Dist. Cuyahoga No. 108275, 2020-Ohio-269, ¶ 86-87.

{¶ 47} With respect to the investigation, any allegations of inadequate police work has no bearing on whether appellant's convictions are against the manifest weight of the evidence. *State v. Johnson*, 8th Dist. Cuyahoga No. 107929, 2019-Ohio-5335, ¶ 11. A manifest weight challenge looks at the quality of the evidence that the state presented at trial. *Id.* A consideration of evidence that was not presented against appellant at trial, regardless of why it was not presented, is irrelevant to our review of this assignment of error. *Id.*

{¶ 48} Appellant argues that there are no fingerprints or DNA linking him to the actual crime scene. The state argues that due to the nature of the crime, it is not unreasonable that appellant's DNA was not found on scene.

{¶ 49} "A lack of physical evidence, standing alone, does not render a defendant's conviction against the manifest weight of the evidence." *State v. Robertson*, 8th Dist. Cuyahoga No. 106279, 2018-Ohio-2934, ¶ 32; *see also State v. Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 37, citing *State v. Rusnak*, 7th Dist. Jefferson No. 15 JE 0002, 2016-Ohio-7820, ¶ 30 (fact that no physical evidence from the crime scene was presented at trial did not render verdict against the manifest weight of the evidence); *State v. Thomas*, 2d Dist. Montgomery No. 27362, 2018-Ohio-4345, ¶ 25 (fact that defendant's conviction was based solely on victim's testimony and not any physical evidence did not render his conviction against the manifest weight of the evidence).

{¶ 50} Although there were no fingerprints or DNA from the appellant on scene, other evidence linked him to the crime. Therefore, the lack of fingerprints or DNA at the crime scene does not render appellant's convictions against the manifest weight of the evidence.

{¶ 51} Appellant next complains that Bizzell is not a credible witness because he is an admitted PCP user, claimed he was having a sexual relationship with the victim, and was accused of attempting to drug the codefendant.

{¶ 52} In this case, Bizzell's testimony explained how he knew the codefendant and why the codefendant and the victim had a physical altercation the

night she was murdered. His testimony was corroborated by the codefendant's testimony, as well as the voicemail left by the victim the night she died, which lends credibility to Bizzell's testimony.

{¶ 53} Next, appellant asserts that Banks's testimony is inconsistent with other evidence admitted at trial. Specifically, Banks's testimony regarding: (1) the time the victim called her, approximately 1:00 a.m., describing the altercation with the codefendant is inconsistent with the 911 call the victim made at 5:16 a.m. wherein the victim tells the 911 operator that she had an altercation with the appellant and codefendant two hours earlier; (2) what floor the altercation with the codefendant occurred; and (3) her description of the downstairs neighbors that she observed two weeks earlier.

{¶ 54} "A defendant is not entitled to reversal on manifest weight grounds merely because certain aspects of a witness' testimony are inconsistent or contradictory." *Flores-Santiago*, 8th Dist. Cuyahoga No. 108458, 2020-Ohio-1274, ¶ 40; *see also State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38 ("'A conviction is not against the manifest weight of the evidence solely because the [factfinder] heard inconsistent testimony.'"), quoting *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11; *State v. Mann*, 10th Dist. Franklin No. 10AP-1131, 2011-Ohio-5286, ¶ 37 ("'While [a factfinder] may take note of the inconsistencies and resolve or discount them accordingly, * * * such inconsistencies do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'"), quoting *State v. Nivens*, 10th Dist. Franklin No. 95APA09-1236,

1996 Ohio App. LEXIS 2245 (May 28, 1996). The jury may detect any number of inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony." *State v. Brown*, 8th Dist. Cuyahoga No. 106667, 2019-Ohio-313, ¶ 21, quoting *State v. Raver*, 10th Dist. Franklin No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 55} Nearly all of Banks's testimony is corroborated by the codefendant's testimony, the victim's 911 call, her voicemail to her brother, and the hair weave found in the hallway. Any inconsistency as to the exact time the altercation occurred is of no consequence to this case. Therefore, we cannot say that the jury clearly lost its way.

{¶ 56} Finally, appellant argues that the codefendant, who is the only witness linking him to the shooting, is inconsistent, unreliable, and suffered from serious mental health issues exacerbated by drug use. Specifically, appellant takes issue with: (1) the codefendant accepting a plea agreement but testifying that she had no role in the victim's death; (2) the codefendant testifying that she does not hallucinate but told the court psychiatric clinic that she hears voices; (3) the codefendant testifying that the victim's door was open and the appellant brushed past her and shot the victim approximately seven times yet the evidence clearly shows a forced entry; and (4) no one else in the apartment complex identified the appellant.

{¶ 57} As this court has recognized, "'[e]ven where discrepancies exist, eyewitness identification testimony alone is sufficient to support a conviction so

long as a reasonable juror could find the eyewitness testimony to be credible.'" *State v. Johnson*, 8th Dist. Cuyahoga No. 111473, 2022-Ohio-4641, ¶ 17, citing *State v. Robinson*, 8th Dist. Cuyahoga No. 100126, 2014-Ohio-1624, ¶ 12, quoting *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 52. Furthermore, as the factfinder, the jury is free to believe all, part, or none of a witness's testimony. *State v. Smith*, 8th Dist. Cuyahoga No. 93593, 2010-Ohio-4006, ¶ 16.

{¶ 58} Much of the codefendant's testimony was corroborated by other witnesses' testimony, 911 calls, DNA evidence, and traffic cameras. Again, the codefendant's attempt to minimize her own involvement in the victim's murder does not affect the overwhelming evidence of appellant's guilt. Therefore, after reviewing the entire record, weighing the inferences, and examining the credibility of witnesses, we cannot say that the jury clearly lost its way and created a manifest miscarriage of justice. Appellant's convictions are not against the manifest weight of the evidence.

{¶ 59} The first assignment of error is overruled.

## III. Conclusion

{¶ 60} The trial court did not abuse its discretion when it admitted the victim's statements because they were admissible as a present-sense impression. Further, the trial court did not abuse its discretion when it excluded Gocan's statements as they were inadmissible hearsay and not relevant. In addition, there was sufficient evidence of "force" to sustain a conviction for aggravated burglary.

Finally, we cannot say that the jury clearly lost its way, thus appellant's convictions are not against the manifest weight of the evidence.

{¶ 61} Accordingly, judgment is affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.  Case remanded to the trial court for further proceedings.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MARY J. BOYLE, JUDGE

EILEEN T. GALLAGHER, P.J., and
FRANK DANIEL CELEBREZZE III, J., CONCUR